EXHIBIT 1

1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7   UNITED STATES OF AMERICA ex rel.        Case No. 13-cv-03891-EMC
    RONDA OSINEK,
8                                            **CONSOLIDATED MEMBER CASES**
                 Plaintiff,
9                                            Case No. 16-cv-01558-EMC
          v.                                 Case No. 16-cv-05337-EMC
10                                           Case No. 18-cv-01347-EMC
    PERMANENTE MEDICAL GROUP, INC,           Case No. 21-cv-03124-EMC
11  et al.,                                  Case No. 21-cv-03894-EMC
12               Defendants.
                                             **ORDER GRANTING IN PART AND
13                                           DENYING IN PART DEFENDANTS'
                                             MOTION TO DISMISS**
14
                                             Docket No. 141
15

16

17

18        The above cases are all predicated on allegations that various Kaiser entities[1] submitted

19  false claims for payment to the federal government as part of the Medicare Part C program, which

20  is also called Medicare Advantage.  *Osinek* was the first-filed case and was followed by five other

21  cases: *Taylor*, *Arefi*, *Stein*, *Bryant*, and *Bicocca*.[2]  The cases were consolidated in June 2021.  *See*

22  *Osinek*, Docket No. 61 (order).  In July 2021, the United States filed a notice that it was

23

24  _____

25  [1] The Kaiser entities are, generally speaking, various Health Plans, Hospitals, and Medical
    Groups.  These entities "publicly hold themselves out and do business collectively as an integrated
26  healthcare provider called "Kaiser Permanente."  U.S. Compl. ¶ 28.

27  [2] *Taylor* was initially filed in the District of Colorado in 2014; *Arefi* in the Central District of
    California in 2015; *Stein* in the Central District of California in 2016; *Bryant* in the Northern
28  District of California in 2016; and *Bicocca* in the Eastern District of California in 2020.

United States District Court
Northern District of California

**EXHIBIT 1**

intervening in part and declining to intervene in part.[3]  *See Osinek*, Docket No. 64 (notice of election).

Currently pending before the Court is Defendants' motion to dismiss based on the first-to-file bar in the False Claims Act ("FCA").  The relevant FCA provision states as follows: "When a person brings an action under this subsection, no person other than the Government may intervene or *bring a related action based on the facts underlying the pending action*."  31 U.S.C. § 3730(b)(5) (emphasis added).  The purpose of the first-to-file bar is twofold: (1) "to promote incentives for whistle-blowing insiders" and (2) "[to] prevent opportunistic successive plaintiffs." *United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1187 (9th Cir. 2001). Defendants argue that, with limited exceptions, the claims presented by the cases that follow *Osinek* are barred.  The *Arefi* plaintiffs have filed a statement of nonopposition with respect to the motion to dismiss their case.  *See* Docket No. 143 (nonopposition).  The plaintiffs in all other cases have opposed dismissal.

Having considered the parties' briefs, as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part Defendants' motion.

## I.  FACTUAL & PROCEDURAL BACKGROUND

A.  United States' Complaint-in-Intervention

Although the United States' Complaint-in-Intervention is not at issue in the pending motion, the Court begins with this pleading as it provides a good overview of the Medicare background.

---

[3] The notice stated as follows:

> Specifically, the United States intervenes on the allegations that defendants Kaiser Permanente; Kaiser Foundation Health Plan, Inc.; Kaiser Foundation Health Plan of Colorado; The Permanente Medical Group, Inc.; Southern California Permanente Medical Group, Inc.; and Colorado Permanente Medical Group, P.C.; submitted, or caused to be submitted, false claims for risk-adjustment payments based on diagnoses improperly added via addenda under Medicare Part C from the years 2009 until present. The United States declines to intervene on all other allegations.

*Osinek*, Docket No. 64 (notice).

United States District Court
Northern District of California

**EXHIBIT 1**

1    "Medicare is a federally operated health insurance program."  U.S. Compl. ¶ 52.  It has

2    four parts:

3         • Part A covers inpatient and institutional care.

4         • Part B covers outpatient care.

5         • Part C is the Medicare Advantage program at issue in this case.

6         • Part D covers prescription drugs.

7    *See* U.S. Compl. ¶ 52.

8         Parts A and B are "traditional" Medicare.

9              [T]he Government reimburses healthcare providers using a fee-for-
              service system, in which providers submit claims to CMS [Centers
10            for Medicare and Medicaid Services] for healthcare services actually
              rendered, such as a provider officer visit or hospital stay.  CMS then
11            pays the providers directly for each service based on payment rates
              predetermined by the Government.
12

13   U.S. Compl. ¶ 53.

14        A Medicare beneficiary can opt out of traditional Medicare and enroll instead in a

15   Medicare Advantage plan managed by a Medicare Advantage Organization ("MAO").  *See* U.S.

16   Compl. ¶ 54.  "CMS reimburses [Medicare Advantage] plans differently than traditional

17   Medicare."  U.S. Compl. ¶ 58.  Specifically, Medicare Advantage uses a "'capitation' payment

18   system."  *United States ex rel. Silingo v. Wellpoint, Inc.*, 904 F.3d 667, 672 (9th Cir. 2018).  Under

19   that system, "private health insurance organizations provide Medicare benefits in exchange for a

20   fixed monthly fee per person enrolled in the program – regardless of actual healthcare usage."  *Id.*

21   The fixed monthly fee for an enrollee is set as follows.  First, there is a predetermined base

22   payment for each enrollee in a Medicare Advantage plan.  *See* U.S. Compl. ¶ 57.  Second, the base

23   payment is then adjusted "to account for (1) demographic factors such as age and gender (among

24   others) and (2) health status.  This is known as risk adjustment."  U.S. Compl. ¶ 58.

25        Risk adjustment is accomplished by assigning each beneficiary a risk score, which "acts as

26   a multiplier that is applied to the [Medicare Advantage] plan's base rate to determine the overall

27   monthly payment for the beneficiary."  U.S. Compl. ¶ 58.  A beneficiary's risk score is determined

28   through a model called the CMS Hierarchical Conditions Category ("CMS-HCC") model, which,

United States District Court
Northern District of California

3

**EXHIBIT 1**

as indicated above, is based on the patient's demographic factors and health status. *See* U.S.

Compl. ¶ 59.  With respect to health status, the model relies on diagnosis codes from the

International Classification of Diseases ("ICD").  *See* U.S. Compl. ¶ 60.  "ICD diagnosis codes are

alphanumeric codes used by healthcare providers, insurance companies, and public health

agencies to represent medical conditions; every disease, injury, infection, and symptom has its

own code."  U.S. Compl. ¶ 62.

> The ICD diagnosis codes included in the CMS-HCC model are grouped into categories of clinically related medical diagnoses that comprise the HCCs (i.e., the categories).  For example, various cancer diagnosis codes are grouped together (e.g., colorectal and bladder cancers).  The CMS-HCC model organizes related conditions into hierarchies based on disease severity and expected cost.  For example, various cancer HCCs are in the same hierarchy, with the HCC associated with metastatic cancer diagnosis codes as the most severe.  If a patient is diagnosed with conditions (diagnosis codes) that correspond to more than one HCC in a hierarchy, only the most severe HCC is kept and any lower-ranking HCCs are dropped.

U.S. Compl. ¶ 63.

> Each HCC is assigned a coefficient.  CMS calculates a beneficiary's risk score by adding the coefficients associated with each of the beneficiary's applicable demographic characteristics (such as age and gender) and the applicable HCCs, if any, that apply to the beneficiary.  A risk score of 1.0 reflects the average expected Medicare-incurred expenses.  A risk score of 0.75 reflects expected costs for a particular beneficiary that are 25% less than the estimated average costs for enrollees in the MA plan, and a risk score of 1.25 reflects expected costs that are 25% greater than the estimated average costs for enrollees in the MA plan.

U.S. Compl. ¶ 65.

The CMS-HCC model is prospective in the sense that it uses diagnoses made in a base

year (the 'service year'), along with demographic information (such as age and gender, among

others), to predict costs for Medicare benefits and adjust payments for the following year (the

'payment year')."  U.S. Compl. ¶ 60.

"To combat the 'incentive for [Medicare Advantage] organizations to potentially over-

report diagnoses,' Medicare regulations require risk adjustment data to be produced according to

certain best practices."  *Silingo*, 904 F.3d at 673.  For example,

4

**EXHIBIT 1**

United States District Court
Northern District of California

1

the diagnosis codes that MA Organizations submit to CMS for risk-adjustment purposes must be:

2

a.    established by a qualified physician;

3

b.    based on a face-to-face medical visit between the patient and physician[4];

4

c.    documented in the medical record; and

5

d.    coded in compliance with the ICD [Official Guidelines for Coding and Reporting], including the limitation that the condition must have required or affected patient care, treatment, or management for the visit.[5]

6

7

8

9    U.S. Compl. ¶ 87 (emphasis added); *see also Silingo*, 904 F.3d at 673 (also noting best practices).

10    "[I]t is an express condition of payment that a Medicare Advantage organization 'certify

11    (based on best knowledge, information, and belief) that the [risk adjustment] data it submits . . .

12    are accurate, complete, and truthful.'" *Id.* (quoting 42 C.F.R. § 422.504(l)(2)).

13    B.    Osinek Complaint

14            The Court turns next to the Osinek Complaint as it provides the baseline for the Court –

15    *i.e.*, the Court will have to compare the Osinek Complaint with the complaints in the other cases to

16    determine whether the cases are related.  *See* 31 U.S.C. § 3730(b)(5) (providing that, "[w]hen a

17    person brings an action under this subsection, no person other than the Government may intervene

18    or bring a related action based on the facts underlying the pending action").[6]

19            The allegations below all come from Ms. Osinek's original complaint filed in 2013.  (Ms.

20

21    [4] For example,

22            even if an MA organization knows that a patient was diagnosed in a prior year with a chronic condition that tends not to go away, the MA organization may not submit the diagnosis for payment for the current year unless the physician has a face-to-face visit with the patient in the current year and the chronic condition required or affected care, management, or treatment during that patient visit.

23

24

25    U.S. Compl. ¶ 85.

26    [5] "In other words, only those conditions that specifically mattered to the patient care, treatment, or management that the physician actually provided at the visit could be submitted to CMS for payment."  U.S. Compl. ¶ 5.

27

28    [6] Similarly, later-filed complaints must be compared with all preceding complaints.

**EXHIBIT 1**

1  Osinek filed an amended complaint in 2021.  For the reasons discussed below, it is Ms. Osinek's

2  original complaint that matters for purposes of the pending motion.)

3          Ms. Osinek has sued "Kaiser Permanente," "a private provider of Medicare Advantage

4  insurance under Medicare Part C."  Osinek Compl. ¶ 2.  Ms. Osinek describes "Kaiser

5  Permanente" as follows:

6              Kaiser Permanente is a California corporation with its principal
               place of business [in] Oakland, California 94612.  Kaiser is one of
7              the largest Medicare Advantage organizations in the country and has
               more enrollees in its Medicare Advantage Plans than any other
8              organization in California.  At all times relevant, Kaiser conducted
               business in California, including but not limited to providing
9              healthcare services through Medicare Advantage plans and to the
               general public in California.
10

11  Osinek Compl. ¶ 6.

12          According to the complaint, starting around 2007, Kaiser Permanente began a "scheme to

13  upcode diagnoses to ensure Medicare payments for reimbursable, high-value conditions."  Osinek

14  Compl. ¶ 2.  Not surprisingly, Kaiser Permanente "focuses . . . on high value conditions" so that it

15  "can maximize its reimbursement from Medicare."  Osinek Compl. ¶ 25.  High-value disease

16  conditions included, *e.g.*, chronic kidney disease, congestive heart failure, depression, chronic

17  respiratory failure, cachexia/protein calories malnutrition, severe obesity, and seizure.  *See* Osinek

18  Compl. ¶ 25.

19          Kaiser Permanente effectuated its upcoding scheme in various ways.  For example:

20      •   Data mining.  Kaiser Permanente used "algorithms to identify [high-value] disease

21          conditions for data mining."  Osinek Compl. ¶ 25.  "Kaiser identified the higher

22          value HCCs and then determined the diagnoses its doctors would need to make to

23          support the HCCs Kaiser wanted to submit for Medicare reimbursement."  Osinek

24          Compl. ¶ 25.

25      •   Refreshing.  Although not clearly described in the complaint, refreshing appears to

26          be a process related to chronic conditions.  *See* Osinek Compl. ¶ 37 (alleging that

27          "Kaiser tracks and rewards physicians based on the percentage of chronic

28          conditions they are able to capture and refresh").  As indicated above, Medicare

United States District Court
Northern District of California

6

**EXHIBIT 1**

United States District Court
Northern District of California

Advantage plans are compensated based on medical conditions diagnosed in the previous payment year.  Therefore, if a patient has a chronic condition, then that condition must be rediagnosed each year – *i.e.*, refreshed.  Presumably, Kaiser Permanente used refreshing "to increase its billings for high value . . . HCCs," Osinek Compl. ¶ 24, because a doctor would be told to include the chronic condition as a diagnosis for a visit even if that condition was not at issue in the patient visit.[7]

- Guidance and policies.  Kaiser Permanente provided guidance or policies that supported upcoding.  For example, "Kaiser told its physicians to diagnose chronic kidney disease instead of the lower value nephritis or nephropathy."  Osinek Compl. ¶ 26.  As another example, "when CMS announces that HCCs are eliminated (and no longer reimbursable by Medicare), Kaiser tells its physicians to change coding practices to reflect new reimbursable codes. . . . In response to CMS's notification that HC 131 will be eliminated, Kaiser promptly sent materials to its staff to begin prompting physicians to code diagnoses for acute kidney injury instead of chronic kidney disease stage 1, 2, or 3, which will be included in the 2014 HCC list and reimbursable by Medicare."  Osinek Compl. ¶ 27.

- Addenda.  In theory, "[a]ll relevant documentation is entered into a medical record at the time of service," but CMS recognizes "there may be times that a provider will need to amend, correct, or enter documentation related to an encounter.  CMS

---

[7] The United States' Complaint provides further context on refreshing.  *See, e.g.*, U.S. Compl. ¶ 7 ("Kaiser also employed a related data-mining program called 'refresh,' where Kaiser would mine patient medical files to find old diagnoses that had not yet been diagnosed in the current service year.  If a physician failed to address any of these old diagnoses at a patient visit, the physician would be provided a list of these 'missed opportunities' – i.e., opportunities for risk-adjustment payment – to create an addendum to retrospectively add these diagnoses to the medical record."); U.S. Compl. ¶ 151 ("Another category of Kaiser's data-mining efforts focused on capturing diagnoses that had been made in a prior year.  Kaiser referred to this program as 'refresh' and to conditions that needed to be captured as 'unrefreshed diagnoses.'  Kaiser created algorithms that mined patients' electronic medical records for any diagnoses that had been made in any setting during the past several (typically three) years.  As detailed below, Kaiser meticulously monitored and tracked these diagnoses, and if a physician failed to re-diagnose these conditions at a patient visit, Kaiser would systematically pressure the physician to add the diagnoses via addenda, as it did with its other data-mining efforts.").

**EXHIBIT 1**

expects supplemental documentation to be occasional and that delayed or amended entries will be entered within a reasonable time frame.  CMS will consider delayed or amended explanations for diagnoses so long as the explanations are for clarification and *not* for substantiating retroactive diagnoses."  Osinek Compl. ¶ 20 (emphasis added).  Kaiser Permanente had its doctors use addenda to retroactively diagnose – *e.g.*, long after a patient visit, for a condition for which the patient was not treated at the time of the face-to-face visit, based on tests run after the face-to-face visit, to change a diagnosis to a higher value and more complicated form of disease, without proper support/documentation, and/or using boilerplate language. *See, e.g.*, Osinek Compl. ¶¶ 28-32.

- Pressuring doctors.  "Kaiser pressures its physicians to addend diagnoses and capture the high value HCCs" – *e.g.*, there is "an escalation process for physicians who do not agree with the data mining prompts"; "[p]hysicians will have to meet one-on-one with Data Quality Trainers if they refused to make diagnoses changes that are presented by data mining"; "physicians have personal report cards based on how they perform in certain areas [including response to refreshing and data mining prompts], which are tied to their compensation"; and there are "mandatory meetings called 'coding parties,' where physicians are gathered in a single room with computers and asked to review past progress notes for addenda related to revised medical diagnoses."  Osinek Compl. ¶¶ 33-35.

## II.  **LEGAL ISSUES**

Before the Court compares *Osinek* and the later-filed cases, it first takes into consideration four legal issues related to the first-to-file bar, each of which will have an impact on the Court's comparison of the cases.

(1) Is the first-to-file bar jurisdictional in nature?

(2) In comparing the first-filed and later-filed actions, should a court look at the original complaints or any amended complaints instead (assuming amended complaints have been filed)?

United States District Court
Northern District of California

8

**EXHIBIT 1**

(3) In comparing the first-filed and later-filed actions, must the facts in the actions be identical in order for a court to apply the first-to-file bar?

(4) In comparing the first-filed and later-filed actions, how should a court proceed where there are different defendants?

A.     Jurisdiction

Although not all courts agree, the Ninth Circuit has expressly held that the first-to-file provision (§ 3730(b)(5)) is jurisdictional in nature. *See, e.g.*, *United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121, 1130 (9th Cir. 2015) (stating that "[w]e treat the first-to-file bar as jurisdictional"); *see also United States ex rel. Marshall v. Univ. of TN Med. Ctr. Home Care Servs., LLC*, No. 3:17-CV-96, 2021 U.S. Dist. LEXIS 159167, at *41 & n.4 (E.D. Tenn. Aug. 23, 2021) (noting that the Fourth, Fifth, Sixth, Ninth, and Tenth Circuits have held that § 3730(b)(5) is jurisdictional but that the D.C., First, Second, and Third Circuits have held that it is not; citing cases).

The Ninth Circuit's view of § 3730(b)(5) as jurisdictional is important because it impacts which complaints should be considered when a court compares the first-filed and later-filed actions. *See* Reply at 4 (making this same point). That issue is addressed below.

In their papers, the *Stein* plaintiffs argue that the first-to-file bar is not jurisdictional. In support, they rely on *Gonzalez v. Thaler*, 565 U.S. 134 (2012), where the Supreme Court stated as follows: "A rule is jurisdictional '[i]f the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional.'" *Id.* at 141. The problem for the *Stein* plaintiffs is that, post-*Gonzalez*, the Ninth Circuit issued *Hartpence* which clearly held that the first-to-file bar is jurisdictional. *See Hartpence*, 792 F.3d at 1130. The *Stein* plaintiffs acknowledge *Hartpence* but contend that the decision should not be given any weight as it relied solely on *Lujan*, 243 F.3d at 1181, a pre-*Gonzalez* decision. The Court rejects the *Stein* Plaintiffs' attempt to avoid *Hartpence*. *Hartpence* is binding authority that is clearly on point and was issued post-*Gonzalez*. It is not up to this Court to decide whether *Hartpence* was wrongly decided because the Ninth Circuit did not explicitly address *Gonzalez*.

United States District Court
Northern District of California

9

**EXHIBIT 1**

United States District Court
Northern District of California

1

B.      Original v. Amended Complaint

2       The next issue for the Court to consider is which complaints should be evaluated in

3  determining whether the first-filed and later-filed actions are related: the original complaints or the

4  amended complaints?  All of the cases before the Court – including *Osinek* – have amended

5  complaints except for *Arefi*.  (As noted above, the *Arefi* plaintiffs do not oppose Defendants'

6  motion to dismiss their suit.)  Below is a timeline with respect to the filing of the complaints.

7

8

| Osinek (2013) | Taylor (2014) | Arefi (2015) | Stein (2016) | Bryant (2018) | Bicocca (2020) |
|---|---|---|---|---|---|
| 8/22/2013 (original complaint) | | | | | |
| | 10/22/2014 (original complaint) | | | | |
| | 11/3/2014 (FAC) | | | | |
| | | 9/4/2015 | | | |
| | | | 5/16/2016 (original complaint) | | |
| | | | 11/3/2016 (FAC) | | |
| | | | | 3/1/2018 (original complaint) | |
| | | | | | 2/10/2020 (original complaint) |
| | | | | | 10/9/2020 (FAC) |
| 7/27/2021 – U.S. notice of election to intervene in part | | | | | |
| 7/29/2021 – Court order granting U.S. request to unseal complaints | | | | | |
| 10/7/2021 (FAC) | | | | | |
| 10/25/2021 – U.S. complaint in intervention | | | | | |
| | | | 11/12/2021 (SAC) | | |
| | 11/15/2021 (SAC) | | | 11/15/2021 (FAC) | |

25      A number of courts have held that a court should compare (1) the original complaint in the

26  later-filed action with (2) whatever was the operative complaint in the first-filed action at the time

27  the later-filed action was filed (which in this case would be the original complaint in *Osinek*).  *See,*

28  *e.g.*:

10

**EXHIBIT 1**

United States District Court
Northern District of California

- *Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276, 1279 (10th Cir. 2004) (stating that "[w]e judge whether § 3730(b)(5) barred Grynberg's [later-filed] qui tam action by looking at the facts as they existed at the time the action was brought"; at the time the Grynberg suit was filed, "Precision's 1992 amended complaint [in the first-filed case] was pending in federal district court").

- *U.S. ex rel. Branch Consultants, L.L.C. v. Allstate Ins. Co.*, 782 F. Supp. 2d 248, 259 (E.D. La. 2011) (hereinafter "*Branch II*") (indicating that "the Court should look to the jurisdictional facts that existed at the time the action was filed, as opposed to facts that existed when the relator later filed an amended complaint").

- *United States ex rel. Cestra v. Cephalon, Inc.*, No. 14-01842, 2014 U.S. Dist. LEXIS 143745, at *7-8 (E.D. Pa. Oct. 9, 2014) (agreeing with *Grynberg* and *Branch*).

- *United States ex rel. Carter v. Halliburton*, No. 1:11cv602 (JCC/JFA), 144 F. Supp. 3d 869, 881 (E.D. Va. 2015) (noting, *inter alia*, that "[i]t is consistent with the jurisdictional limitation to apply the first-to-file bar at the time the initial complaint is filed, rather than when the complaint is amended").

- *United States ex rel. Marshall v. Univ. of TN Med. Ctr. Home Care Servs., LLC*, No. 3:17-CV-96, 2021 U.S. Dist. LEXIS 159167, at *24 (E.D. Tenn. Aug. 23, 2021) (also agreeing with *Grynberg* and *Branch*).

In the case at bar, Defendants advocate for this approach, and most of the plaintiffs agree – but not all. *See, e.g.*, Stein Opp'n at 3 n.2 (arguing that the Court should consider the SAC which was filed in November 2021); Bicocca Opp'n at 5 (arguing that the Court should consider the FAC which was filed in October 2020).

The district court in *Branch II* has provided the most extensive analysis as to why the above approach should be followed. *Branch II* was the later-filed action. The first-filed action was known as *Rigsby*. After Branch filed its original complaint in August 2006, it filed two different amended complaints. The court gave several reasons why – for purposes of § 3730(b)(5) – the original complaint in *Branch II* (and not any amended complaint) should be compared with

11

**EXHIBIT 1**

the complaint in *Rigsby*.

First, the text of § 3730(b)(5) supports this approach.

> The first-to-file bar [in § 3730(b)(5)] and the original source exception to the public disclosure bar [in § 3730(e)(4)] refer specifically to jurisdictional facts that must exist when an "action," not a complaint, is filed. Under 31 U.S.C. § 3730(b)(5), *a qui tam* plaintiff may not "bring a related action based on the facts underlying the pending action." As the Seventh Circuit has noted, "[*o*]*ne 'brings' an action by commencing suit*." *United States ex rel. Chovanec v. Apria Healthcare Group Inc.*, 606 F.3d 361, 362 (7th Cir. 2010). Further, in order to be an original source under 31 U.S.C. § 3730(e)(4)(B), a relator must provide the information on which the allegations are based to the government "before filing an action under this section which is based on the information." Both provisions appear to contemplate that certain requirements must be met at the time a qui tam action is filed. The use of the term "action" in both provisions indicates that the Court should look to the jurisdictional facts that existed at the time the action was filed, as opposed to facts that existed when the relator later filed an amended complaint.
>
> As the Third Circuit has noted, however the FCA is based on the model of a single-count complaint, and it sometimes uses the term "action" when it likely means "claim." *United States ex rel. Merena v. SmithKline Beecham Corp.*, 205 F.3d 97, 101-02 (3d Cir. 2000). For example, under § 3730(b)(2) and (4), the government may choose to "proceed with the action" or may "decline to take over the action," yet it is commonplace for the government to proceed with only certain claims and not with others. *Id.* at 102. But even if "action" can mean "claim" in some contexts, it is perfectly natural to read the first-to-file bar and the original source provision as imposing certain requirements that must be met at the time the suit begins.

*Branch II*, 782 F. Supp. 2d at 259-60 (emphasis added).

Second, general jurisdictional principles also support the approach.

> The notion that a court cannot proceed if it lacked jurisdiction at the time the original complaint was filed is consistent with the "time-of-filing rule," under which "the jurisdiction of the Court depends upon *the state of things at the time of the action brought*[.]" *Mollan v. Torrance*, 22 U.S. 537, 539 (1824) (diversity jurisdiction exists if the parties are diverse when the action was brought, even if diversity is not maintained throughout the litigation) . . . .

*Id.* at 260 (emphasis added).

Third, the Supreme Court's decision in *Rockwell International Corp. v. United States*, 549 U.S. 457 (2007), does not conflict with the above approach.

> While the ruling [in *Rockwell*] focused on the original source

**EXHIBIT 1**

United States District Court
Northern District of California

provision [rather than the first-to-file provision], it also made broader jurisdictional statements that are relevant to the FCA as a whole.  In *Rockwell*, the relator brought a *qui tam* action relating to toxic waste disposal at a nuclear weapons plant.  The Supreme Court held that the relator was not an original source of new allegations in the amended complaint just because he was an original source of the allegations in the original complaint.  *Id.* at 473-74.  The Court concluded that the relator, "at a minimum," must be an original source of the claims in the amended complaint.  *Id.* at 473.  But the Court did not suggest that the original complaint becomes irrelevant for jurisdictional purposes once an amended complaint is filed.  To the contrary, the Court stated that its holding was consistent with "[t]he rule that subject-matter jurisdiction 'depends on the state of things at the time of the action brought.'"  *Id.* (quoting *Mollan v. Torrance*, 22 U.S. 537, 539 (1824)). . . . [Cases cited in *Rockwell*] indicate that a court cannot proceed if it lacked jurisdiction at the time the initial complaint was filed.

*Rockwell* goes on to state that jurisdiction is also defeated if a plaintiff amends the complaint to withdraw the allegations upon which the court's jurisdiction is based, "unless they are replaced by others that establish jurisdiction." . . . But *Rockwell* does not suggest that a plaintiff can establish jurisdiction by amendment when jurisdiction did not previously exist.  Indeed, such a conclusion would be directly contrary to the Court's statement that "demonstration that the original allegations were false will defeat jurisdiction."

*Id.* at 261-62.

Finally, there are several practical/policy reasons to support the approach.  For example,

the pre-filing disclosure requirement of § 3730(e)(4)(B) could not function if a court could acquire jurisdiction over a *qui tam* complaint through amendment.  If a court could gain jurisdiction over a *qui tam* action by amendment, then a relator could neglect to inform the government of the information upon which the allegations are based before filing his or her action.  Instead, the relator could provide that information to the government at a later time, and then amend the complaint, even in a trivial fashion, to ensure jurisdiction.  Such a procedure would make the statutory language requiring disclosure to the government "before filing an action" meaningless.

*Id.* at 263.

In addition,

while the first-to-file bar of 31 U.S.C. § 3730(b)(5) encourages relators to quickly report fraud about which they become aware, problems arise when a relator files without yet having direct and independent knowledge of the information underlying the allegations. As discussed *infra*, the Fifth Circuit has held that even skeletal allegations can bar other actions under the first-to-file bar in at least some circumstances.  *See United States ex rel. Branch*

13

**EXHIBIT 1**

United States District Court
Northern District of California

*Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 379 (5th Cir. 2009). It would be anomalous if a relator could secure a place in the jurisdictional queue with merely skeletal allegations, only to then file an amended complaint after actually becoming an original source, and thereby trump any meritorious, related actions that were filed in the meantime. *Cf. United States ex rel. Ortega v. Columbia Healthcare, Inc.*, 240 F. Supp.2d 8, 14 (D.D.C. 2003) (amended complaint could not "relate back" to the date the original complaint was filed in order to jump ahead in line). Such an approach would shut out deserving relators while rewarding those who bring actions without having direct and independent knowledge of their publicly disclosed allegations. A relator, under this scenario, could secure first-to-file status before actually conducting the investigation that uncovers direct and independent information about the fraud. Requiring jurisdiction at the time the original complaint was filed allows a court to dismiss such an attempt, regardless of later amendments.

*Id.* at 264.[8]

Finally, the time-of-filing rule has the advantage of simplicity. The benefits of a clear-cut rule are apparent in this case, which involves multiple claims, complaints, and defendants, as well as other relators whose complaints have themselves been amended and involve multiple defendants. *See United States ex rel Rigsby v. State Farm Ins. Co.*, No. 06-433, 2006 U.S. Dist. LEXIS 98179 (S.D. Miss. 2006) (discussed *infra*); *United States ex rel Denenea v. Allstate Ins. Co.*, No. 07-2795, 2011 U.S. Dist. LEXIS 6419 (E.D. La.); *United States ex rel Sonnier v. Allstate Ins. Co.*, No. 09-1038 (M.D. La.). The Court's jurisdiction may expand or shrink as amendments are made to the complaint, but that jurisdiction must rest upon a solid foundation.

*Id.*

The analysis in *Branch II* is sound and persuasive. Furthermore, the analysis in *Branch II* does not conflict with Ninth Circuit law, including *Hartpence*. Admittedly, in *Hartpence*, the Ninth Circuit made the following comment in a footnote: "For purposes of determining jurisdiction, we look to the allegations in the amended complaints. *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473-74 (2007)." *Hartpence*, 792 F.3d at 1125 n.2. But this footnote in *Hartpence* does not mean that, for purposes of the first-to-file bar, that a court should look to an amended pleading in a later-filed case.

---

[8] Relatedly, if the rule were that an amended complaint in the later-filed action should be considered (and not the original), that would give the relator in the later-filed action an incentive to amend its complaint once the first-filed action becomes public – *i.e.*, so as to try to distinguish the later-filed action from the first-filed action.

14

**EXHIBIT 1**

First, *Hartpence* referred to two different FCA provisions, not only the first-to-file bar (in § 3730(b)(5)) but also the public disclosure bar (in § 3730(e)(4)).  *Hartpence*'s reference to *Rockwell* in footnote 2 may well have related to the public disclosure bar, which would make sense since *Rockwell* was a public disclosure case and not a first-to-file case

Second, as the *Branch II* court pointed out, *Rockwell* (the case that *Hartpence* cited) acknowledged the "rule that subject-matter jurisdiction 'depends on the state of things at the time of the action brought.'"  *Rockwell*, 549 U.S. at 473.

Third, *Rockwell*'s statement that "courts look to the amended complaint" must be evaluated in context.  The *Rockwell* Court noted that, if "original allegations [related to jurisdiction] were false," then jurisdiction is defeated.  *Id.*  "So also will the withdrawal of those allegations unless they are replaced by others that establish jurisdiction.  Thus, when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction."  *Id.* at 473-74.  As indicated by the above text, the *Rockwell* Court made the last statement in the context of a plaintiff *withdrawing* allegations that gave rise to jurisdiction and pleading new allegations.

Finally, courts have recognized the context in which the *Rockwell* statement above was made and thus taken note of the limits of *Rockwell*.  For instance, the Fifth Circuit has stated:

> The [*Rockwell*] Court did not hold . . . that the original complaint is irrelevant to jurisdiction or that a relator need not establish jurisdiction from the moment he first files his action.  Indeed, *Rockwell* did not speak to the question whether a relator can use an amended complaint to establish jurisdiction when the original complaint is lacking.  Consequently, we fall back on the longstanding rule that the amendment process cannot "be used to create jurisdiction retroactively where it did not previously exist."  If [the relator's] complaint did not establish jurisdiction, it should have been dismissed; his amendments cannot save it.

*U.S. ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 328 (5th Cir. 2011).  Similarly, in *Strudley v. Santa Cruz County Bank*, 747 F. App'x 617 (9th Cir. 2019), the Ninth Circuit held that the plaintiffs could not amend as a matter of right to cure a jurisdictional defect in the original complaint.  "In line with Supreme Court precedent, this Circuit has adhered to the time-of-filing rule, which provides that '[s]ubject matter jurisdiction must exist as of the time the action is

15

**EXHIBIT 1**

commenced.'" *Id.* at 618.  The court went on to reject the plaintiffs' reliance on *Rockwell*.

> *Rockwell* stands for the proposition that a plaintiff may voluntarily amend its original complaint to *remove* federal jurisdiction (except when a case has been removed to federal court).  Plaintiffs amended their complaint for the exact opposite purpose in this case [*i.e.*, in the attempt to create jurisdiction].  Therefore, the district court correctly looked to the original complaint in concluding that it lacked subject matter jurisdiction over this case.

*Id.*; *see also Black Hills Media, LLC v. Pioneer Corp.*, No. CV 13-05980 SJO (PJWx), 2014 U.S. Dist. LEXIS 132030, at *9 (C.D. Cal. Jan. 14, 2014) ("The court in *Rockwell* had jurisdiction over the original complaint when it was first filed, and the issue before the Supreme Court was whether the amended complaint *divested* the court of that existing jurisdiction.  The Supreme Court determined that it did so.  The opposite was true in [a Federal Circuit case], where the court had no jurisdiction over the original complaint, and the amended complaint would therefore grant the court jurisdiction that would not otherwise exist.") (emphasis added).

Accordingly, the Court shall compare the original complaint in *Osinek* (*i.e.*, the operative complaint in the first-filed action at the time the later-filed action was filed) with the original complaints in the later-filed actions.

## C.     "Identical Facts" Test v. "Material Facts" Test

Turning to the heart of the matter, the Court considers next what is the legal standard for determining whether a first-filed suit and a later-filed suit are related for purposes of § 3730(b)(5).  Like other circuit courts, the Ninth Circuit has rejected the position that the first-filed and later-filed actions must be based on "identical facts" in order to be deemed related.  Instead of an "identical facts" test, the Ninth Circuit applies a "material facts" test.

> Most of the few courts that have addressed § 3730(b)(5) have rejected an identical facts test.  The cases' common principle is that "section 3730(b)(5) precludes a subsequent relator's claim that alleges the defendant engaged in the same type of wrongdoing as that claimed in a prior action even if the allegations cover a different time period or location within a company." *United States ex rel. Capella v. United Technologies Corp.*, 1999 U.S. Dist. LEXIS 10520, 1999 WL 464536, at *9 (D. Conn. June 3, 1999) (summarizing the tests used by other courts).  The Third Circuit, the only appellate court to discuss and apply § 3730(b)(5), rejected an identical facts test.  *See LaCorte*, 149 F.3d at 233-34.  We find the Third Circuit's reasoning persuasive.

16

**EXHIBIT 1**

United States District Court
Northern District of California

Section 3730(b)(5)'s plain language refers to "related" not "identical" actions.  Therefore, we need not review the legislative history.  *See Hockings*, 129 F.3d at 1071.  Even if the language were considered ambiguous, the single sentence from the legislative history does not compel a different result.  Furthermore, an identical facts test would defeat the congressional objectives for the 1986 amendments: "adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own."  *United States ex rel. Springfield Terminal Ry. v. Quinn*, 304 U.S. App. D.C. 347, 14 F.3d 645, 649 (D.C. Cir. 1994).  Limiting § 3730(b)(5) to only bar actions with identical facts would be contrary to the plain language and legislative intent: (1) using a narrow jurisdictional bar, such as an identical facts test, would decrease incentives to promptly bring qui tam actions; (2) multiple relators would expect a recovery for the same conduct, thereby decreasing the total amount each relator would potentially receive and incentives to bring the suit; and (3) a narrow identical facts bar would encourage piggyback claims, which would have no additional benefit for the government," since once the government knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds."  *LaCorte*, 149 F.3d at 234.

Therefore, we hold that § 3730(b)(5) bars later-filed actions alleging the same material elements of fraud described in an earlier suit, regardless of whether the allegations incorporate somewhat different details.

*Lujan*, 243 F.3d at 1188-89; *see also United States ex rel. St. John LaCorte v. SmithKline Beecham Clinical Labs., Inc.*, 149 F.3d 227, 234 (3d Cir. 1998) (stating that, "once the government knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds").

As a practical matter, the material facts test often has a court consider "whether the [later-filed] Complaint alleges a fraudulent scheme the government already would be equipped to investigate based on the [first-filed] Complaint."  *United States ex rel. Batiste v. SLM Corp.*, 659 F.3d 1204, 1209 (D.C. Cir. 2011) (noting, for example, "[i]f the government investigated the facts alleged in [first-filed] complaint on a nationwide basis, it would discover continuing fraud in the New Jersey offices [which was the focus of the later-filed complaint]"); *see also id.* at 1210 (stating that "[s]ection 3730(b) is designed to allow recovery when a *qui tam* relator puts the government on notice of potential fraud being worked against the government, but to bar copycat actions that provide no additional material information"); *Hartpence*, 792 F.3d at 1125, 1131-32 ("disagree[ing] that [the later-filed] action provided no additional benefit to the government"; the

**EXHIBIT 1**

plaintiff in the later-filed suit "provided information about a different form of fraud, and without that information the government might not have investigated beyond [defendant's] fraudulent coding practices").[9]

As a frame of reference, below is a brief discussion of some cases where the material facts test was not met and where the material facts test was met.

### 1. Material Facts Test Not Satisfied

In *Hartpence*, the Ninth Circuit held that the material facts test was not satisfied. The defendant in *Hartpence* was KCI, a company that manufactured medical devices that speeded the healing of wounds. One such device was a V.A.C. (vacuum assisted closure) device. *See id.* at 1124. "V.A.C. devices perform negative pressure wound therapy ('NPWT')," and Medicare has covered NPWT devices as durable medical equipment. *Id.*

In the first-filed suit, the plaintiff Hartpence alleged that KCI had engaged in fraudulent conduct by submitting claims to Medicare related to the V.A.C. devices. Specifically, Hartpence asserted that KCI had submitted claims with a certain billing code, which indicated compliance with certain requirements even though those requirements had not, in fact, been met in various ways. *See, e.g.*, *id.* at 1125 (noting that "Hartpence alleges that KCI improperly submitted claims with the KX modifier [*i.e.*, billing code]: (1) when there was no wound improvement in the

---

[9] Dr. Taylor contends that this notice standard is no longer applicable after *Kellogg Brown & Root Servs. v. United States ex rel. Carter*, 575 U.S. 650 (2015). *See* Taylor Opp'n at 21-22 n.23. In support, he cites an opinion from a Washington district court, *United States ex rel. Savage v. CH2M Hill Plateau Remediation Co.*, No. 4:14-cv-5002-EFS, 2015 U.S. Dist. LEXIS 137979 (E.D. Wash. Oct. 1, 2015). There, the court stated: "The Supreme Court's ruling in *Brown* inherently limits this 'notice' analysis. Applying a broad 'notice' test does not serve the FCA's purpose of providing private parties the opportunity to pursue actions alleging fraud against the government *once the first-to-file bar lifts following the dismissal of the earlier action*." *Id.* at *22 (emphasis added).

As indicated by the language italicized above, *Savage* has no application here because the first-filed action – *Osinek* – has not been dismissed and therefore the first-to-file bar cannot have not been lifted. *See also Brown*, 575 U.S. at 662 (indicating that "an earlier suit bars a later suit while the earlier suit remains undecided but ceases to bar that suit once it is dismissed"; rejecting the argument that the first-filed action remains pending even after it has been dismissed).

Moreover, the Ninth Circuit's decision in *Hartpence* – which applied the notice standard above – was issued *after* the Supreme Court's decision in *Brown*. *Brown* was decided in May 2015, and *Hartpence* in July 2015.

**EXHIBIT 1**

United States District Court
Northern District of California

1   previous month; (2) for the treatment of wounds for which V.A.C. therapy was neither reasonable

2   nor necessary; (3) when the required wound measurement documentation was absent; [etc.]").

3        In the later-filed suit, the plaintiff Godecke also claimed that KCI had improperly used the

4   same billing code – albeit for a different reason.  *See id.* (taking note of allegation that "KCI

5   violated the FCA by knowingly misusing the KX modifier in submitting claims for a full month of

6   V.A.C. therapy, even when the therapy  . . . had been stopped and restarted within the same

7   month").  In addition, Godecke claimed that there was a FCA violation related to DWOs (detailed

8   written orders).  Suppliers of durable medical requirement were required to obtain DWOs from a

9   patient's treating physician before dispensing the supplied for which they sought reimbursement

10  from Medicare.  *See id.* at 1125 n.4.  According to Godecke, "KCI ignored the requirement to

11  receive correct and completed [DWOs] before delivering supplies and beginning therapy."  *Id.* at

12  1125.

13       The Ninth Circuit effectively acknowledged the similarity of the Hartpence and Godecke

14  complaints in that both implicated improper use of the same billing code (even though there were

15  different reasons why the billing code was not properly used).  However,

16          Godecke's second claim involves different underlying facts.
           Whereas Hartpence's claims all allege knowing misuse of the KX
17          modifier [*i.e.*, billing code], Godecke's second claim is based on
           facts which show KCI's violation of a *different Medicare program*
18          *requirement* – the requirement that a provider receive Detailed
           Written Orders for the V.A.C. device before beginning to treat
19          patients with the device. . . . [T]he claims are based on different
           material facts.  The rules governing use of KX modifiers and DWOs
20          were disseminated at different times, in different publications, and
           are plainly treated as separate regulations under the program.

21

22          We further disagree that Godecke's action provided no additional
           benefit to the government.  Unaided by Godecke's complaint, the
23          government may have never discovered that KCI, in addition
           allegedly to misusing the KX coding system, was allegedly
24          submitting V.A.C. claims before receiving DWOs.  The two alleged
           frauds are materially different: the KX fraud allegations are based on
25          *government payment for devices which were used, but unnecessary*
           *for treatment*, while the DWOs fraud allegations are based on the
26          *government paying for devices that were never used at all*.  The
           alleged frauds, in short, exist completely independent of one
27          another.

28  *Id.* at 1131 (emphasis added).

**EXHIBIT 1**

2.      Material Facts Test Satisfied

In *United States ex rel. Hampton v. Columbia/Hca Healthcare Corp.*, 318 F.3d 214 (D.C. Cir. 2003), the D.C. Circuit concluded that the material facts test was satisfied.  The plaintiff Hampton's suit was the later-filed suit.  The first-filed suit was brought by Boston.  According to Hampton, the defendant companies and several employees had improperly billed the government under the Medicare program for home health services – *e.g.*,

> the companies billed for services that were miscoded; already paid for; performed by others; never administered; or supposedly administered to Hampton's mother after she died in 1996.  Hampton also claimed that [the companies] submitted bills for supplies and medications that were unnecessary or never received; and that they billed for services to patients who did not qualify under the Medicare guidelines, did not need treatment, or were not charged required copayments.  The companies submitted false or inaccurate documentation to the government and, so she alleged, shredded documents in order to destroy evidence of the fraud.

> [The D.C. Circuit held that Hampton's case and Boston's case were related because] Boston's allegations were along very much the same lines.  He asserted that HCA home health subsidiaries billed the government for services that did not meet the Medicare eligibility criteria, for undocumented services, and for services not medically necessary.  He also alleged that they submitted false or inaccurate Medicare documentation and destroyed documents.

*Id.* at 219.

Likewise, in *Batiste*, the D.C. Circuit also found the first- and later-filed cases related.  The plaintiff Batiste filed the later action.  Zahara filed the earlier action.  The court found that "[a] side-by-side comparison has persuaded us that, although the complaints allege somewhat different facts, Zahara's complaint suffices to put the U.S. government on notice of allegedly fraudulent forbearance practices at [Sallie Mae] and its subsidiaries, and Batiste's complaint alleges the same material elements of the same fraud."  *Id.* at 1209.  In particular,

> Zahara and Batiste broadly allege that the same fraudulent activities occurred at each of their offices, for the same reasons, and that similar SLM corporate policies promoted the fraudulent behavior.  They both allege SLM fraudulently increased its profits and promoted its standing with the Department of Education by falsifying forbearances.  And both allege that SLM's corporate culture promoted increasing the dispensation of forbearances through  quotas and a team bonus system.  Though Zahara focused on the fabrication of oral forbearance requests, and Batiste focused

**EXHIBIT 1**

United States District Court
Northern District of California

on the offering of forbearances to unqualified borrowers, the allegations of the first complaint give the government grounds to investigate all that is in the second.

Under the . . . material facts test, these complaints allege essentially the same corporation-wide scheme.  The Zahara Complaint would suffice to equip the government to investigate SLM's allegedly fraudulent forbearance practices nationwide.  Batiste's additional details would not give rise to a different investigation or recovery.

*Id.* at 1209-10.

D.     Different Defendants

Finally, the Court must consider whether it makes a difference in "material facts" when different defendants are sued in the first-filed and later-filed actions.  In *Osinek*, the original complaint named only one defendant – Kaiser Permanente – which Ms. Osinek described as "a private provider of Medicare Advantage insurance under Medicare Part C."  Osinek Compl. ¶ 2.

Kaiser Permanente is a California corporation with its principal place of business [in] Oakland, California 94612.  Kaiser is one of the largest Medicare Advantage organizations in the country and has more enrollees in its Medicare Advantage Plans than any other organization in California.  At all times relevant, Kaiser conducted business in California, including but not limited to providing healthcare services through Medicare Advantage plans and to the general public in California.

Osinek Compl. ¶ 6.  The later-filed actions named a variety of different Kaiser entities, including but not limited to Kaiser Permanente.

| COMPARISON OF DEFENDANTS NAMED IN ORIGINAL COMPLAINTS | | | | | |
|---|---|---|---|---|---|
| **Osinek (2013)** | **Taylor (2014)** | **Arefi (2015)** | **Stein (2016)** | **Bryant (2018)** | **Bicocca (2020)** |
| Kaiser Permanente | Kaiser Permanente | | Kaiser Permanente | Kaiser Permanente | |
| | Kaiser Foundation Health Plan, Inc. | Kaiser Foundation Health Plan, Inc. | Kaiser Foundation Health Plan, Inc. | Kaiser Foundation Health Plan, Inc. | |
| | Kaiser Foundation Health Plan of Colorado | Kaiser Foundation Health Plan of Colorado | Kaiser Foundation Health Plan of Colorado | | |

**EXHIBIT 1**

United States District Court
Northern District of California

United States District Court
Northern District of California

| COMPARISON OF DEFENDANTS NAMED IN ORIGINAL COMPLAINTS | | | | | |
|---|---|---|---|---|---|
| Osinek (2013) | Taylor (2014) | Arefi (2015) | Stein (2016) | Bryant (2018) | Bicocca (2020) |
| | Kaiser Foundation Health Plan of Georgia | Kaiser Foundation Health Plan of Georgia, Inc. | Kaiser Foundation Health Plan of Georgia, Inc. | | |
| | Kaiser Foundation Health Plan of the Northwest | Kaiser Foundation Health Plan of the Northwest | Kaiser Foundation Health Plan of the Northwest | | |
| | | Kaiser Foundation Hospitals | Kaiser Foundation Hospitals | Kaiser Foundation Hospitals | |
| | | Southern California Permanente Medical Group | Southern California Permanente Medical Group | Southern California Permanente Medical Group | Southern California Permanente Medical Group, Inc. |
| | | The Permanente Medical Group | The Permanente Medical Group | The Permanente Medical Group | Permanente Medical Group, Inc. |
| | | Colorado Permanente Medical Group, P.C. | Colorado Permanente Medical Group | Colorado Permanente Medical Group P.C. | |
| | | The Southeast Permanente Medical Group | The Southeast Permanente Medical Group | Southeast Permanente Medical Group | |
| | | Hawaii Permanente Medical Group | Hawaii Permanente Medical Group | Hawaii Permanente Medical Group | |
| | | Northwest Permanente, P.C. | Northwest Permanente, P.C. | | |
| | | | Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. | | |
| | | | Kaiser Foundation Health Plan of Washington | | |

22

**EXHIBIT 1**

| COMPARISON OF DEFENDANTS NAMED IN ORIGINAL COMPLAINTS | | | | | |
|---|---|---|---|---|---|
| Osinek (2013) | Taylor (2014) | Arefi (2015) | Stein (2016) | Bryant (2018) | Bicocca (2020) |
| | | | Mid-Atlantic Permanente Medical Group | Mid-Atlantic Permanente Medical Group, PC | |
| | | | Group Health Permanente | | |
| | | | | The Permanente Federation, LLC | The Permanente Federation, LLC |
| | | | | Northwest Permanente Physicians & Surgeons, P.C. | |
| | | | | Washington Permanente Medical Group | |

The Ninth Circuit has not expressly addressed the issue of different defendants, but other circuit courts have. Most have indicated that "adding a new defendant to the mix does not *necessarily* allow a later-filed action to evade the first-to-file bar." *Cho v. Surgery Partners, Inc.*, No. 20-14109, 2022 U.S. App. LEXIS 8774, at *15 (11th Cir. Apr. 1, 2022) (emphasis in original). This is particularly true where the new defendant(s) named in the later-filed action is a subsidiary or affiliate of the defendant(s) named in the first-filed action. *See Branch I*, 560 F.3d at 379 (noting that "allegations of fraud against a corporation may bar subsequent allegations of fraud against the corporation's subsidiaries").

That being said, the fact that the new defendant(s) in the later-filed action is a subsidiary or affiliate of the defendant(s) in the first-filed action does not automatically mean that the first-filed and later-filed actions are related either. Ultimately, resolution depends on how the first-filed action defines the scope of the misconduct. If there are, *e.g.*, allegations in the first-filed suit that there was a nationwide problem or a corporate-wide problem, then, most likely, the fact that new subsidiaries or affiliates are named in the later-filed action will not make that action unrelated for purposes of § 3730(b)(5). *Cf. Batiste*, 659 F.3d at 1210 (related complaints "essentially alleged

**EXHIBIT 1**

same corporate-wide scheme").  On the other hand, if the first-filed action focuses on a local

problem, then, most likely, a broader-in-scope later-filed action will not be related, even if the new

defendant(s) in the latter action is an affiliate of the defendant named in the earlier action.  *Cf.*

*United States ex rel. Chovanec v. Apria Healthcare Group, Inc.*, 606 F.3d 361, 364 (7th Cir. 2010)

(stating that, "to understand whether the suits materially overlap we must know whether the initial

suits alleged frauds by rogue personnel at scattered offices or instead alleged a scheme

orchestrated by Apria's national management").

      "Two cases from the D.C. Circuit, *Hampton* and *Heath*, serve as useful bookends for this

analysis."  *Cho*, 2022 U.S. App. LEXIS 8774, at *15.  *Hampton* found the first- and later-filed

actions at issue related; *Heath* found the first- and later-filed actions at issue unrelated.

      1.    <u>Hampton</u>

      In *Hampton*, the plaintiff Hampton named the following defendants in her later-filed

action: HCA; Clinical Arts (Georgia subsidiary of HCA); and several Clinical Arts employees.

She alleged that the defendants "had improperly billed the government under the Medicare

program for home health services."  *Hampton*, 318 F.3d at 218.  The court was asked to decide

whether Hampton's action was barred by an earlier lawsuit, filed by Boston.  The D.C. Circuit

noted that

> Hampton thinks her complaint differs significantly from Boston's
> because it named different defendants.  Boston sued only HCA.
> Hampton sued not only HCA but also HCA's subsidiary Clinical
> Arts and several Clinical Arts employees.  As Hampton sees it,
> Boston's complaint cannot possibly have covered fraud by Clinical
> Arts and its employees because it (1) fails to name Clinical Arts or
> its employees as defendants and (2) specifically mentions fraud at
> HCA home health care subsidiaries in six states that do not include
> Georgia.

*Id.*  The court, however, found that

> these are not differences in the material elements of the fraud.
> Boston was a senior manager in HCA's home care group.  *He
> alleged a corporate-wide problem*, revealed through internal audits,
> in which HCA perpetrated fraud in providing home health care
> services *through numerous subsidiaries*.  It is true that Boston's
> complaint mentioned instances of fraud at particular home health
> agencies in only six specific states, not including Georgia.  But
> Boston's complaint described these as *"examples" and "samplings"*
> of "a huge number of illegal payments from Medicare . . . received

**EXHIBIT 1**

United States District Court
Northern District of California

> by Columbia/HCA's 550 home health locations *in 37 states*." Given Boston's broad allegations based on his position as an HCA insider, Hampton's naming Clinical Arts – a specific HCA subsidiary – and naming individual employees of Clinical Arts were merely variations on the fraud Boston's complaint described.

*Id.* (emphasis added); *see also Batiste*, 659 F.3d at 1209 (acknowledging that plaintiff in first-filed suit "discusses activities at [a Sallie Mae] subsidiary office in Nevada, but [still] alleges a nationwide scheme attributable not only to the subsidiary, but also to [Sallie Mae]"; thus, "[i]f the government investigated the facts alleged in [that plaintiff's] complaint on a nationwide basis, it would discover continuing fraud in the New Jersey offices"); *Chovanec*, 606 F.3d at 364 (taking note of allegations that fraud was enabled by changes made to a computer system used in all of a company's offices; also taking note of allegations that national headquarters provided guidance that enabled fraud); *United States ex rel. Marion v. Heald Coll., LLC*, No. 5:12-cv-02067-PSG, 2015 U.S. Dist. LEXIS 97767, at *11 (N.D. Cal. July 24, 2015) (stating that "[a]llowing plaintiffs to escape the first-to-file bar by naming specific employees who carried out a previously-alleged corporate fraud contravenes the purpose of Section 3730(b)(5) – to prevent piggyback claims[;] [h]ere, the previously-filed complaints against Corinthian [Colleges] allege that fraudulent conduct extended far beyond individual campuses and pervaded the entire company").

### 2.   *Heath*

In *United States ex rel. Todd Heath v. AT&T, Inc.*, 791 F.3d 112 (D.C. Cir. 2015), the plaintiff Heath filed the later-filed action against AT&T and nineteen of its subsidiaries. The lawsuit was related to a federal program known as the Universal Service Fund. *See id.* at 117. Under federal law, "every interstate telecommunications carrier must contribute a portion of its quarterly interstate and international telecommunications revenue to the . . . Fund." *Id.* at 116. One of the programs administered through the Fund is "E-Rate," which "entitles qualifying schools and libraries to receive Internet and telephone services at discounted rates." *Id.* at 116-17. According to Heath,

> AT&T orchestrated and implemented through its subsidiaries a corporate-wide scheme to have false claims submitted to the Universal Service Fund by depriving schools and libraries in the E-Rate program of the lowest corresponding price for services. Schools and libraries, unaware of those overcharges, then passed

**EXHIBIT 1**

those inflated costs on to the federal government for reimbursement through the Universal Service Fund.

*Id.* at 117.  Of particular note, Heath asserted that AT&T deliberately or recklessly chose not to train its employees in the lowest-corresponding-price requirement.  *See id.* (taking note of allegation that AT&T was a recidivist violator of the E-Rate Program).

Heath had also filed an earlier lawsuit but only against Wisconsin Bell, which was a wholly owned subsidiary of AT&T.  *See id.* at 118.  In this suit, Heath asserted that "Wisconsin Bell charged some E-Rate eligible schools more than others, and that Wisconsin Bell generally failed to provide school districts with the benefit of the favorable pricing it offered to state departments, agencies, and universities."  *Id.*  Furthermore, "[w]hen informed of this pricing discrepancy, Wisconsin Bell's sales representatives 'regularly denied the existence of the agreements' between Wisconsin Bell and other Wisconsin agencies."  *Id.*

One issue before the D.C. Circuit was whether Heath's first-filed suit was a bar to his later-filed action.  The court held that the first-filed suit was not a bar because the

> two complaints target factually distinct types of frauds.  The Wisconsin Bell Complaint alerted the federal government only to a limited scheme by Wisconsin Bell to defraud the E-Rate program within Wisconsin.  That alleged fraud was accomplished, in part, through affirmative misrepresentations by Wisconsin Bell employees to schools and libraries within Wisconsin, in which those employees openly denied the existence of a state contract with a lower corresponding price.

> In contrast, the AT&T Nationwide Complaint alleges a different and more far-reaching scheme to defraud the federal government through service contracts entered into across the Nation, and then to cover up that fraud.  Critically, the alleged fraud was accomplished not through affirmative misrepresentations about the lowest corresponding price, but through institutionalized disregard of the lowest-corresponding-price requirement altogether in AT&T's employee-training and billing procedures.  According to the AT&T Nationwide Complaint, AT&T and its subsidiaries deliberately failed to enforce that lowest-price mandate by refusing to train or even tell employees about that limitation on charges, and by failing to incorporate that limitation into its billing practices.

*Id.* at 121.

The court continued:

> On its face, the Wisconsin Bell complaint discloses nothing more than the rogue actions of individuals within a single AT&T subsidiary and their specific, overt misrepresentations.  Nothing in

**EXHIBIT 1**

1
2
3
4

the complaint would have alerted the United States government to a nationwide scheme centered in AT&T's corporate headquarters of mischarging the E-Rate program and subsequently concealing those overpayments.  Nor, given the affirmative misrepresentations at issue, would the Wisconsin Bell Complaint have pointed the federal government to AT&T's systematic refusal to institutionalize compliance by employees with the lowest-corresponding-price requirement.

5
6
7
8
9
10

The fraud thus manifested itself in sufficiently distinct ways in the two cases that the material elements of the fraud differ.  As the Seventh Circuit has recognized, "to understand whether the suits materially overlap we must know whether the initial suit[] alleged frauds by rogue personnel at scattered offices or instead alleged a scheme orchestrated by * * * national management."  Because the Wisconsin Bell Complaint alleged only the former, it did not disclose the nationwide fraud grounded in institutionalized training and enforcement failures, and compounded by efforts at concealment, that is the focus of Heath's later complaint.

11   *Id.* at 121-22 (citation omitted).  The D.C. Circuit distinguished, *inter alia*, *Hampton* because,

12   there, "the first complaint alleged a broad fraudulent scheme orchestrated by a national or parent

13   company, and the second complaint merely added additional facts or widened the circle of victims

14   of the same fraudulent conduct."  *Id.*

15
16
17
18
19
20

Those cases stand for the simple proposition that the greater fraud often includes the lesser.  The problem for AT&T is that the lesser fraud does not, without more, include the greater.  The Wisconsin Bell Complaint did not allege that AT&T encouraged Wisconsin Bell's fraud or affirmative misrepresentations, or even knew anything about them.  Nor did the Wisconsin Bell Complaint suggest that AT&T and its subsidiaries engaged in "uniform billing practices" across the United States.  There simply is no hint in the Wisconsin Bell Complaint of a country-wide, institutionalized corporate practice of disregarding the lowest-price requirement or of a calculated refusal to educate or train employees.

21   *Id.* at 122-23.

22          The court acknowledged AT&T's point that the E-Rate program is a national program but,

23   it pointed out, so too "is virtually every law policed by the *federal* False Claims Act."  *Id.* at 123

24   (emphasis in original).  The first-to-file bar could not be triggered "every time an initial complaint

25   alleges that a subsidiary of a national company violated a national law" or "a broad swath of False

26   Claims Act coverage" would be "erase[d]."  *Id.*  The court underscored that the purpose of the

27   first-to-file bar was "to prevent copycat litigation, which tells the government nothing it does not

28   already know" but, here, "Heath's complaints go after two materially distinct fraud schemes."  *Id.*;

United States District Court
Northern District of California

27

**EXHIBIT 1**

*see also United States ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371, 379 (5th Cir. 2009) (stating that the first-filed action "*Rigsby* does not allege a true industry-wide fraud or concerted action among a narrow group of participants[;] [r]ather, looking only at the facts pleaded . . . , *Rigsby* implicates, at most, four specific [write-your-own] insurers among the approximately ninety-five WYI insurers conducting business in the Louisiana and Mississippi areas during Hurricane Katrina," and, therefore, "*Rigsby* tells the government nothing about which of the ninety-one other WYO insurers . . . , if any, actually engaged in any fraud").

### III.    COMPARING RELATOR ACTIONS

Having reviewed the major legal issues, the Court may now turn to a comparison of the first-filed action, *Osinek*, with the various later-filed actions.  The Court makes the comparisons in the order listed below because, *e.g.*, if there are material differences between *Osinek* and *Taylor*, that would effectively make *Taylor* the first-filed action for the new material facts.  In other words, the remaining cases would then need to be compared to both *Osinek* and *Taylor*.

- Case No. C-21-3894 EMC *Taylor* (filed in the District of Colorado in 2014 and transferred to this District in 2021).
- Case No. C-16-1558 EMC *Arefi* (filed in the Central District of California in 2015 and transferred to this District in 2016).
- Case No. C-16-5337 EMC *Stein* (filed in the Central District of California in 2016 and transferred this District in 2016).
- Case No. C-18-1347 EMC *Bryant*.
- Case No. C-21-3124 EMC *Bicocca* (filed in the Eastern District of California in 2020 and transferred to this District in 2021).

A.    *Osinek* and *Taylor*[10]

Dr. Taylor argues that his case is materially different from *Osinek* in two ways: (1) different defendants were sued in each case and (2) different frauds were implicated in each case.

---

[10] Dr. Taylor argues his FAC is the operative complaint for purposes of comparing his case to cases filed after his.  *See* Taylor Opp'n at 6 n.4.  But for purposes of comparing *Osinek* and *Taylor*, the Court compares the *Osinek* complaint to Dr. Taylor's original complaint.  At the time Dr. Taylor brought his case, there was only the original complaint in *Osinek* on file.

**EXHIBIT 1**

United States District Court
Northern District of California

1.   Different Defendants

Ms. Osinek sued only one entity: Kaiser Permanente.  In contrast, Dr. Taylor sued multiple Kaiser entities: Kaiser Permanente; Kaiser Foundation Health Plan, Inc.; Kaiser Foundation Health Plan of Colorado; Kaiser Foundation Health Plan of Georgia; and Kaiser Foundation Health Plan of the Northwest.

Dr. Taylor argues that the difference in defendants is meaningful.  Defendants argue to the contrary.  They take the position that, by suing "Kaiser Permanente," Ms. Osinek implicitly sued a national defendant which therefore covered all regional or local subsidiaries or affiliates.  Defendants further argue that allegations made in the Osinek Complaint show that Ms. Osinek was implicating a nationwide fraud.  *See* Mot. at 20.  The Court finds that the Osinek complaint does not allege a nationwide fraud.

As a starting point, the Court takes note that there does not appear to be any legal entity with the name "Kaiser Permanente."  Rather, "Kaiser Permanente" seems to be a trade name used by various Kaiser entities.  *See* Mot. at 1 (asserting that there are "various healthcare organizations operating under the Kaiser Permanente trade name"); *cf.* U.S. Compl. ¶ 28 (noting Kaiser's Health Plans, Permanente Medical Groups, and hospitals publicly hold themselves out and do business collectively as an integrated healthcare providers called 'Kaiser Permanente'"); Taylor Compl. ¶ 16 (alleging that "Kaiser Permanente is a non-profit care consortium" that "includes three main groups: (1) the Kaiser Foundation Health Plan, Inc. and its subsidiaries; (2) the Kaiser Foundation Hospitals and their subsidiaries; and (3) the Permanente Medical Groups").  Thus, the fact that Ms. Osinek (not to mention Dr. Taylor and others) sued "Kaiser Permanente" is not particularly telling one way or the other.

What is more significant are the allegations in Ms. Osinek's complaint – specifically, the geographic scope of the allegations.  The complaint implicates California only.  For example, Ms. Osinek describes "Kaiser Permanente" as follows:

> a California corporation with its principal place of business *[in] Oakland* . . . . Kaiser is one of the largest Medicare Advantage organizations in the country and has more enrollees in its Medicare Advantage plans than any other organization *in California*.  At all times relevant, Kaiser conducted business *in California*, including

United States District Court
Northern District of California

29

**EXHIBIT 1**

but not limited to providing healthcare services through Medicare Advantage plans and to the general public *in California*.

Osinek Compl. ¶ 6 (emphasis added).

One might argue that the above paragraph is California-centric because Ms. Osinek was simply trying to establish that jurisdiction in California is proper. However, nowhere in the complaint does Ms. Osinek allege that there is a problem outside of California. She does not mention any other state. She does not allege a "corporate-wide problem" as in *Hampton*, 318 F.3d at 218. She never even uses the term "nationwide" or "corporate-wide" or otherwise suggest a "'scheme orchestrated by . . . national management.'" *Heath*, 791 F.3d at 122 (quoting *Chovanec*, 606 F.3d at 364). Nor is it not clear that any practice identified by Ms. Osinek was necessarily nationwide or corporate-wide in nature – *e.g.*, there is no suggestion that data mining through the use of algorithms was implemented through a nationwide computer system.

Defendants contend that just because the Osinek Complaint gave California examples does not mean that the pleading is limited in scope to California. In principle, this is true. But there must be some indication in the pleading that the problem extends outside of California.[11] *Compare Hampton*, 318 F.3d at 218 ("It is true that Boston's complaint mentioned instances of fraud at particular home health agencies in only six specific states, not including Georgia. But Boston's complaint described these as 'examples' and 'samplings' of 'a huge number of illegal payments from Medicare . . . received by Columbia/HCA's 550 home health locations in 37 states.'"). Indeed, if the rule were to the contrary, then there would seem to be serious policy concerns. The mere fact that a defendant company is part of a larger network of affiliated companies would be enough to deem the government on notice of a nationwide or corporate-wide problem – which would then, under the first-to-file bar, cut off all other actions. But if the government declined to investigate on a nationwide or corporate-wide scale (*e.g.*, because of limited resources), and the first filer stayed within the limited scope of its complaint as pled, then no one else would be able to bring a FCA claim to address a potentially broader problem. This

---

[11] Notably, where the Osinek Complaint does at one point refer to different regions, both of the regions identified are still based in California. *See* Mot. at 20 (citing Osinek Compl. ¶ 37); Osinek Compl. ¶ 37 (alleging that "Kaiser positioned the Southern California Region against Northern California in competition for the highest risk scores and physician approval rates").

**EXHIBIT 1**

United States District Court
Northern District of California

1   would run counter to the FCA which is meant to encourage the uncovering of fraud against the

2   government.  The first-to-file bar would not only "prevent copycat litigation," *Heath*, 791 F.3d at

3   123, but also a wide swath of litigation far broader than the first-filed suit.  Here, *Taylor* is not

4   simply an "opportunistic successive suit," *Lujan*, 243, F.3d at 1187; *Taylor* cannot be said to have

5   "provided no additional benefit to the government."  *Hartpence*, 792 F.3d at 1131.

6          Confronted with this obstacle, Defendants invoke the practical aspect of the material facts

7   test, which asks whether "[t]he first-filed claim provides the government notice of the essential

8   facts of an alleged fraud."  *Lujan*, 243 F.3d at 1187.  Defendants note that, a few months after the

9   *Osinek* complaint was filed in 2013, the government issued four subpoenas to (1) the Kaiser

10  Foundation Health Plan; (2) the Permanente Medical Group; (3) Southern California Permanente

11  Medical Group; and (4) Kaiser Foundational Hospitals.  The subpoenas covered not only the

12  named entities but also *all subsidiaries and affiliates*.[12]  *See* RJN, Exs. A-D (subpoenas).  Thus,

13  Defendants argue, the government implicitly understood that *Osinek* pointed to a nationwide or

14  corporate-wide problem.  Defendants add that, in 2017, the government sent a letter to Defendants

15  seeking the production of documents from the Colorado regions specifically – and cited to the

16  2013 subpoenas in support of that request.  *See* RJN, Ex. E.

17         Defendants' contention is not convincing for several reasons.  First, Dr. Taylor raises a

18  legitimate argument that only the complaints should be considered in determining whether the

19  first-to-file bar applies – not evidence outside of the complaints.  *Cf. In re Natural Gas Royalties*

20  *ex rel. United States*, 562 F.3d 1023, 1031 (10th Cir. 2009) (stating that "[t]he first-to-file bar is

21  designed to be quickly and easily determinable, simply requiring a side-by-side comparison of the

22  complaints"); *Batiste*, 659 F.3d at 1209 (making a "side-by-side comparison" of the complaints in

23  the first-filed and later-filed suits).  Dr. Taylor has not been privy to all of the communications

24

25  [12] *See, e.g.*, RJN, Ex. A (Subpoena at 2) ("The term 'KAISER FOUNDATION HEALTH PLAN,
    INC.' refers to the person or entity with its principal offices located at One Kaiser Plaza, Oakland,
26  California, and also includes all current and former: directors, officers, principals, partners,
    managers, and employees; independent contractors, attorneys, consultants, experts, investigators,
27  agents and/or other persons or other representatives acting on your behalf, even if their actions
    were not authorized by you or were outside the proper scope of their authority; corporate parents,
28  predecessors, *subsidiaries*, regions, segments, branches, groups, *affiliates*, and divisions; and joint
    ventures of which it is a part.") (emphasis added).

**EXHIBIT 1**

United States District Court
Northern District of California

1    between the United States and Defendants. It is entirely possible that some communications might

2    support his position here rather than Defendants.[13] And if the Court were to permit Dr. Taylor to,

3    in effect, conduct discovery into the government's communications – or more generally, into the

4    government's understanding of the *Osinek* complaint – then there would effectively be a mini trial

5    on a secondary matter that would only delay the process of moving forward with the case. The

6    task before the Court at this juncture is to compare the complaints, not conduct a mini-trial based

7    on facts.

8         Accordingly, the Court does not dismiss *Taylor* based on the first-to-file bar because

9    *Taylor* is broader in scope than *Osinek* in terms of defendants. *See Heath*, 791 F.3d at 122

10   ("Those cases [such as *Hampton*] stand for the simple proposition that the greater fraud often

11   includes the lesser. The problem for AT&T is that the lesser fraud does not, without more, include

12   the greater.").

13        2.   <u>Different Frauds</u>

14         The closer question is whether *Taylor* implicates different frauds than does *Osinek*.

15         As noted above, *Osinek* is about mining records to look for places to upcode, particularly

16   for high-value conditions. Upcoding was ultimately improper because it was based on, *e.g.*,

17   exaggerating a patient's condition, diagnosing a patient based on a test that took place after the

18   patient visit, diagnosing a patient for a condition for which the patient was not treated, diagnosing

19   without the proper support/documentation, and the like.

20         *Taylor* is essentially the flip side. It asserts the theory that, as a result of regular internal

21   audits, Kaiser knew there were high error rates in risk adjustment claims in certain areas but *failed*

22   to take action to find the false claims retroactively – and thus improperly retained the

23

24

_____

25   [13] Even if the Court were to consider the 2013 subpoenas issued by the government and its 2017
letter to Defendants, Defendants do not fare any better. Although the subpoenas did refer to

26   subsidiaries and affiliates, that language is boilerplate in nature. And fact that the government
only issued subpoenas to four specific Kaiser entities (all of which appear to be based in

27   California) points to a more limited scope of inquiry. As for the letter, the fact that the
government relied on the 2013 subpoenas to justify an inquiry into Colorado in 2017 largely

28   seems a litigation tactic. Notably, by 2017, the *Taylor* complaint – which expressly implicated the
Colorado region – had been filed. (The original complaint in *Taylor* was filed in October 2014.)

**EXHIBIT 1**

government's overpayment for those false claims (essentially, a reverse false claim theory).[14] *See, e.g.*, Taylor Compl. ¶¶ 81-82 (citing "[e]xamples of risk adjustment claims that the Kaiser audits have identified as routinely false" and alleging that, "despite its knowledge that the categories of risk adjustment claims . . . are false a significant percentage of the time, Kaiser routinely fails to take reasonable steps to identify which of these claims are false . . . and then to prevent their submission in the first place or to delete them after submission"). *Taylor* contrasts the lack of effort by the Kaiser entities to take action to address the errors with their zealous pursuit of reviewing records to find instances where diagnoses could be added (*i.e.*, upcoding). *See* Taylor Compl. ¶ 62 (alleging that Kaiser's "lack of diligence contrasts starkly with [its] considerable efforts and substantial commitment of resources to audit current and past claims to identify new diagnoses that it could use to submit additional risk adjustment claims and thereby increase the amount of the risk adjustment payments it receives from CMS.").

Dr. Taylor argues that the flip side makes his case materially different from *Osinek*. Specifically, he argues that his case, unlike *Osinek*, focuses on (1) Kaiser's failure to act even after audits revealed high error rates for certain HCCs or diagnoses; (2) Kaiser's failure to act even after audits revealed high error rates for diagnoses made by external providers; and (3) Kaiser's failure to act even after audits revealed high error rates for "True Positive" results associated with Kaiser's Natural Language Processing program. Each of these claimed differences is discussed below.

---

[14] In their papers, Defendants suggest that Dr. Taylor does not have a viable claim here: "Taylor's allegations about error rates identified in audits of diagnosis-code data do not identify a unique fraud scheme. Rather they purport to show that Defendants had *knowledge* of the upcoding scheme that Osinek already alleged." Reply at 3 (emphasis added). Defendants likely make this argument because, in its complaint, the United States alleges that "Kaiser's internal audits put [it] on . . . notice of fraudulent diagnoses." U.S. Compl. at 68; *see also* U.S. Compl. ¶ 304 (alleging that "[a] variety of internal audits provided further notice that Kaiser's addenda and query practices were resulting in false claims to CMS").

Although Defendants fairly argue that the audits are relevant to Kaiser's knowledge, it is not clear why Dr. Taylor would not also have a viable claim based on the theory that Kaiser failed to take corrective action which resulted in its being able to keep government overpayments for false claims in violation of the FCA. *Cf. United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1173 (9th Cir. 2016) (indicating that plaintiff had a viable theory based on allegations that, in the face of audit error rates in excess of 20%, defendants conceived and directed retrospective reviews that were "designed to identify only favorable reporting errors").

**EXHIBIT 1**

United States District Court
Northern District of California

a.  High Error Rates for Certain HCCs or Diagnoses

Dr. Taylor first claims a violation of the FCA because Kaiser failed to act even after audits revealed high error rates in risk adjustment claims for certain HCCs or diagnoses.  For example, Dr. Taylor alleges as follows with respect to cancer:

- "Every year, Kaiser's National Compliance Office ('NCO') conducts a nationwide 'Probe' audit to test the accuracy of risk adjustment claims submitted the prior year."  Taylor Compl. ¶ 69.

- The Probe Audits "have consistently identified cancer (HCCs 7-10) as the most upcoded condition."  Taylor Compl. ¶ 102.

- "The most significant and consistent error is that Kaiser providers submit diagnosis codes representing active, current treatment of cancer when, in fact, the patient's cancer is cured, in remission, or otherwise irrelevant to the services provided to the patient."  Taylor Compl. ¶ 103.  Notably, a diagnosis of "history of cancer" does not result in a risk adjustment.  *See* Taylor Compl. ¶ 105.

Cancer is not the only HCC/diagnosis called out as problematic.  Other conditions that have had high error rates include:

- Stroke.  *See, e.g.*, Taylor Compl. ¶ 118 ("Kaiser knew stroke was commonly coded as an active event, when, in fact, the patient should have been classified as having a history of stroke.").

- Vascular disease.  *See, e.g.*, Taylor Compl. ¶ 127 ("[S]ome claims erroneously claimed the patient had current vascular disease, when, in fact, they had only a history of the condition."); Taylor Compl. ¶ 129 ("[C]ertain claims were false because of a 'mismapping' problem with HealthConnect, Kaiser's EMR [electronic medical records].  HealthConnect . . . allows physicians to choose a descriptive diagnosis (as opposed to a specific ICD-9 code) when entering clinical information.  HealthConnect then 'maps' this descriptive diagnosis to a specific ICD-9 diagnosis code, which is then inserted into the medical record documentation.").

- Chronic bronchitis.  *See, e.g.*, Taylor Compl. ¶ 134 ("Kaiser's EMR [electronic

34

**EXHIBIT 1**

United States District Court
Northern District of California

medical records] . . . pressured physicians to use the diagnosis for chronic bronchitis (which risk adjusts) rather than acute bronchitis (which does not risk adjust).”); Taylor Compl. ¶ 132 (“The probe audits regularly found COPD [chronic obstructive pulmonary disease] claims erroneous based on lack of documentation in the record, or because the doctor failed to document the patient’s condition with sufficient specificity to determine if the patient actually had COPD.”).

- Malnutrition. *See, e.g.*, Taylor Compl. ¶ 140 (“In some cases, the condition was diagnosed as current when the patient actually only had a ‘history of’ the condition.”).

- Renal insufficiency. *See, e.g.*, Taylor Compl. ¶ 152 (“Chronic kidney disease (‘CKD’) is a condition that is often miscoded . . . .”).

As indicated by the above, Dr. Taylor takes issue with Kaiser for not reacting to the high error rates – *i.e.*, had Kaiser done so then it would have seen that the diagnoses (of high-value conditions) lacked documentation or proper support and/or that the diagnoses were irrelevant to the treatment provided to the patient. Although Dr. Taylor is correct that his claim here is about Kaiser ignoring an upcoding problem (as revealed by error rates) rather than actively creating upcoding, the Court does not see this flip side as creating a material difference with respect to *Osinek*. This is because both *Taylor* and *Osinek* are ultimately based on the same “underlying facts,” *Hartpence*, 792 F.3d at 1131: that the high-level condition that was diagnosed did not have documentation or proper support and/or did not affect patient care.

The practical aspect of the material facts test underscores that *Taylor* and *Osinek* are related cases, at least with respect to the above. Here, the Court must ask whether the allegations in *Osinek* “[gave] the government grounds to investigate all that is in” the Taylor Complaint. *Batiste*, 659 F.3d at 1209; *see also id.* at 1209-10 (stating that the first-filed “[c]omplaint would suffice to equip the government to investigate SLM's allegedly fraudulent forbearance practices nationwide” and the “additional details” in the later-filed complaint “would not give rise to a different investigation or recovery”). Based on *Osinek*, the government was put on notice that high-value conditions often did not have proper support and were diagnosed even when a patient

**EXHIBIT 1**

was not treated for that condition at the time of service. Thus, in light of *Osinek*, the government had grounds to investigate all that is in the Taylor Complaint which points to the same basic problem. That, according to Dr. Taylor, the problem would have been revealed if Kaiser had taken action in response to the high error rates, is somewhat beside the point. The error rates here are not in themselves what is critical; rather, at bottom, Dr. Taylor's broader claim is that high-value conditions were diagnosed without following the practices required by Medicare regulations. This is fundamentally the same charge that Ms. Osinek makes.

> b. <u>High Error Rates for Diagnoses Made by External Providers</u>

Dr. Taylor also claims that his complaint is different from the Osinek Complaint because he has alleged that Kaiser failed to act even after audits revealed high error rates with diagnoses submitted by external providers. (Dr. Taylor refers to this as "one-way look chart review" in his papers. *See, e.g.*, Taylor Opp'n at 7.) The relevant allegations in support of this theory are as follows:

- Several of Kaiser's regions, including Colorado, Hawaii, and, until recently, Georgia, "rely heavily on external providers (hospitals or other facilities who are not owned by Kaiser) to provide inpatient care to Kaiser's HMO members." Taylor Compl. ¶ 83.

- The external providers submit claims to Kaiser after they have provided services to Kaiser members, and Kaiser uses the external providers' diagnoses as the basis for the risk adjustment claims that Kaiser submits to CMS. *See* Taylor Compl. ¶ 84.

- Kaiser's audits "have identified significant error rates in risk adjustment claims [that] Kaiser submitted to CMS based on diagnoses provided by external providers." Taylor Compl. ¶ 86. For example, for the Colorado region, the error rates for external providers in some years was over 40% and 60%. *See* Taylor Compl. ¶ 88; *see also* Taylor Compl. ¶ 89 (adding that "[t]he error rates for certain large hospitals . . . are striking" – some more than 90%).

- "Despite knowing of the consistent errors in claims data from external providers, Kaiser Colorado [for example] does not conduct any routine targeted audits of

**EXHIBIT 1**

1    claims submitted by external providers.  This is particularly egregious because the

2    Colorado region does have a coder review each hospital stay at an external provider

3    *to look for additional diagnoses* present in the chart but not coded by the treating

4    physician."  Taylor Compl. ¶ 98 (emphasis added).

5    Here, the Court agrees with Dr. Taylor that this specific aspect of his case is not related to

6  *Osinek*.  Problematic coding related to high-value conditions is different from problematic coding

7  by external providers.  Notably, there is no indication that the problematic coding by external

8  providers was related to high-value conditions.  Accordingly, this specific claim made by Dr.

9  Taylor involves "different underlying facts."  *Hartpence*, 792 F.3d at 1131.  Furthermore, it cannot

10  be said that the government would likely have found the particular problem with external

11  providers based on its investigation into the kinds of internal upcoding practices identified in

12  *Osinek*.

13    c.    Natural Language Processing Software

14    Finally, Dr. Taylor claims that his complaint differs from the Osinek Complaint because he

15  has made allegations about Kaiser's Natural Language Processing ("NLP") software.  The main

16  allegations made in the Taylor Complaint with respect to the NLP software are as follows.

17    • "Broadly speaking, [a] NLP program uses an algorithm to search EMRs [electronic

18       medical records] to find words that, individually or in combination, indicate that a

19       patient has certain diagnoses."  Taylor Compl. ¶ 191.

20    • Kaiser developed its own NLP audit program "to try to find new diagnosis codes to

21       submit."  Taylor Compl. ¶ 191.

22    • "All face-to-face visits to a physician or hospital . . . are run through the NLP

23       software to identify new diagnoses that might be appropriate to use for submission

24       of additional risk adjustment claims.  The results are grouped into four categories:

25       (a) True Positive: [meaning] diagnoses . . . have been confirmed by two Kaiser

26       coders; (b) More Information Needed: [meaning] diagnoses . . . may be present, but

27       further analysis is required to confirm; (c) Problem List Only: [meaning] diagnoses

28       . . . show up only on the member's problem list [section of the medical record] with

37

**EXHIBIT 1**

1      no documentation of treatment; and (d) False Positives or Found Elsewhere."

2      Taylor Compl. ¶ 196.

3      • "Kaiser allows the various regions to decide how to use [the above] information."

4      Taylor Compl. ¶ 197.  For some regions, if a result is True Positive, then a claim is

5      submitted to CMS for payment – without any further review.  *See* Taylor Compl. ¶

6      200.  This is true even though audits have revealed that there is a high error rate for

7      True Positives.  *See* Taylor Compl. ¶¶ 198, 200.

8          As indicated by the above, Dr. Taylor is not focusing here on the fact that Kaiser uses the

9 NLP program to mine records for instances where it can upcode.  Had he done so, then his case

10 would clearly be related to *Osinek*.  Rather, Dr. Taylor's point is that there is a high error rate

11 associated with the NLP program's True Positives, but Kaiser still submits claims based on True

12 Positives without any further inquiry.

13         The Court finds that the nature of wrongdoing claimed by Dr. Taylor here involves

14 different "material elements" from *Osinek*.  *Lujan*, 243 F.3d at 1189.  Dr. Taylor is charging

15 Kaiser with exploiting True Positives; this is different from *Osinek* which is focused on the

16 exploitation of high-value conditions.  Similar to above, there is nothing that suggests True

17 Positives appear with high-value conditions only, or even primarily.  Thus, Dr. Taylor here has

18 "'significant information to contribute of [his] own.'"  *Id.*  The Court also notes that, under the

19 practical aspect of the material facts test, this part of *Taylor* should not be deemed related to

20 *Osinek*.  Based on *Osinek*, the government would likely have looked at the NLP program given

21 that it was purportedly used to data mine; however, that would not lead the government to

22 question the True Positive results yielded by the NLP program.  Rather, as a facial matter, the

23 more likely candidates for exploitation by Kaiser would be the categories of "More Information

24 Needed" and "Problem List Only," not the True Positives.

25         d.   <u>Summary</u>

26         The *Taylor* case is not dismissed in its entirety but only in part.  *Taylor* differs materially

27 from *Osinek* in three ways: (1) *Taylor* points to a nationwide or corporate-wide problem whereas

28 *Osinek* is local or regional (*i.e.*, California-centric) in nature; (2) *Taylor* has identified a fraud

**EXHIBIT 1**

United States District Court
Northern District of California

1   related to external providers rather than high-value conditions; and (3) *Taylor* asserts a problem

2   with Kaiser failing to evaluate the True Positives results yielded by the NLP program.

3   B.      *Osinek* and *Arefi*

4           As noted above, the *Arefi* Plaintiffs do not oppose the motion to dismiss their complaint.

5   Thus, the Court may move on to the next complaint filed after *Arefi*.

6   C.      *Osinek* and *Stein*

7           As an initial matter, the Court takes note that the *Stein* plaintiffs contend that the Court

8   should compare the complaint in *Osinek* with their operative SAC, which was filed in November

9   2021.  *See* Opp'n at 3 n.2.  The Court rejects that argument for the reasons discussed above.

10          Based on their original complaint, the *Stein* plaintiffs focus on two specific conditions:

11  sepsis and malnutrition.[15]  The main allegations are as follows.

12          •   Sepsis.  The criteria for diagnosing sepsis is not straightforward.  *See, e.g.*, Stein

13              Compl. ¶¶ 42-43, 49.  In 2003, the ICD-9 diagnostic codes and ICD Guidelines

14              were modified to, in essence, reflect that complexity.  The Guidelines emphasize

15              that "coders will likely have to query physicians when documenting Sepsis to

16              trigger proper documentation that supports the Sepsis diagnosis due [to] the

17              complex nature of those diseases."  Stein Compl. ¶ 48.  Defendants engaged in a

18              scheme "to up-code and falsely diagnose MA enrollees with sepsis and/or severe

19              sepsis, i.e., sepsis with acute organ failure[] (collectively referred to as 'Sepsis')[,]

20              when Sepsis was not present."  Stein Compl. ¶ 50.  "[The] fraudulent scheme

21              [involved] the identification and treatment of Sepsis for . . . MA enrollees that

22              presented in the emergency room (ER) of [Kaiser] hospitals and was accomplished

23              by (a) [Defendants] implementing unwritten policies that prohibited coders

24              employed by [Defendants] from performing physician queries for Sepsis diagnoses

25              as required by the ICD-9 Guidelines, (b) implementing unwritten policies

26

27  [15] The *Stein* plaintiffs also included in their original complaint allegations on Kaiser's practice of
    "refreshing."  However, in their opposition, they have conceded that this conduct was sufficiently
28  implicated in earlier-filed actions.  *See* Stein Opp'n at 1 (stating that the *Stein* plaintiffs "do not
    oppose [the] first-to-file attack against [their] Refresh fraud claim").

**EXHIBIT 1**

requiring Kaiser's coders to code ICD-9 diagnosis codes for Sepsis based solely on the physician's instructions to code Sepsis instead of relying on the supporting clinical findings documented in the medical record, (c) using an improper Sepsis diagnostic standard that overstated the frequency of Sepsis diagnoses, (d) aggressively diagnosing Sepsis as part of a strategy to lower the reported Sepsis mortality rates at [Kaiser] hospitals throughout California, and (e) [Defendants], as an express condition of receiving capitation payments from CMS, routinely and annually falsely certifying that such ICD-9 diagnosis codes for Sepsis were accurate, complete, and truthful . . . ."  Stein Compl. ¶ 50.

- Malnutrition.  Defendants "participated in a fraudulent scheme to up-code and falsely diagnose malnutrition and severe malnutrition of their MA enrollees." Stein Compl. ¶ 70.  The scheme "was conducted at all [Kaiser] Hospitals throughout California and involved the diagnoses and coding of malnutrition and severe malnutrition based upon assessment performed by dieticians . . . . The . . . dietician used a rubber stamp on the MA enrollee's medical record indicating that in his/her opinion the MA enrollee suffered from malnutrition or severe malnutrition.  [The] physicians then countersigned the stamp in the MA enrollees' medical record.  Based solely on the presence of the physician's countersignature . . ., Kaiser's coders recorded the ICD-9 diagnosis codes for malnutrition or severe malnutrition . . . ."  Stein Compl. ¶ 70.  There was no face-to-face encounter nor were there clinical findings in support, as required by federal regulations.  *See* Stein Compl. ¶ 71.

These claims overlap with *Osinek*.  *Osinek* asserts that upcoding was improper because it was based on exploiting high-value conditions – *e.g.*, exaggerating a patient's condition, diagnosing a patient based on a test that took place after the patient visit, diagnosing a patient for a condition for which the patient was not treated, diagnosing without the necessary support/documentation, and the like.  *Stein* implicates the same kind of conduct; essentially, *Stein* involves lesser-included conduct by virtue of the fact that it focuses on two conditions (sepsis and

40

**EXHIBIT 1**

United States District Court
Northern District of California

1  malnutrition) specifically.  Notably, *Osinek*, like *Stein*, expressly identified malnutrition as one of

2  the high-value conditions that was being exploited.[16]  *See* Osinek Compl. ¶ 25.  The fact that

3  *Osinek* did not also expressly identify sepsis as a high-value condition (as *Stein* did) is not

4  dispositive since it is but one example of the alleged upcoding.  *Cf. Hampton*, 318 F.3d at 219

5  (concluding actions were related because both alleged that bills were submitted for ineligible and

6  undocumented Medicare services and for services not medically necessary).

7          The *Stein* plaintiffs suggest that their case is still materially different because the frauds

8  implicated in their complaint were committed when "patients . . . were admitted to a KFH hospital

9  or in the case of Sepsis, treated as a hospital outpatient through the emergency room."  Opp'n at

10 12-13.  But nothing about *Osinek* excepts a hospital setting from the alleged upcoding.

11         The only place where *Stein* is materially different from *Osinek* is with respect to the scope

12 of the alleged misconduct.  *Stein* suggests – by virtue of the Kaiser entities sued – that the alleged

13 misconduct goes beyond California.  While this does make *Stein* different from *Osinek* (the latter

14 being California-centric in scope), *Stein* runs into a problem still because *Taylor*, the next case

15 filed after *Osinek*, implicates a nationwide or corporate-wide problem and is broad enough to

16 encompass the basic kind of upcoding practices alleged in *Stein*.

17         The Court therefore dismisses the *Stein* case based on the first-to-file bar – in its entirety.

18 The *Stein* plaintiffs have asked for leave to amend but that is a futile request since the Court's

19 evaluation is limited to the original Stein Complaint.

20 D.      *Osinek* and *Bryant*

21         As a preliminary matter, the Court takes note that Defendants do not seek to dismiss

22 *Bryant* in its entirety.  It recognizes that *Bryant* has retaliation claims (based on the FCA and on

23

24 [16] The Stein FAC (filed in May 2016, *i.e.*, a few months after the original Stein Complaint) did
   add in a new condition – i.e., aortic atherosclerosis ("AA").  *See* Stein FAC ¶ 83 (noting that AA
25 "is a chronic condition that results in the build up of arterial plaque or fatty deposits in the
   patient's aorta").  According to the Stein Plaintiffs, "Kaiser's coders coded . . . MA patients with
26 an AA diagnosis based solely upon the physician's notation of AA in the medical record, without
   the medical record reflecting that the patient was treated for his/her AA condition."  Stein FAC ¶
27 84.  Even if the Court were to consider this new condition identified in the Stein FAC (as well as
   the Stein SAC), there would still be overlap with the *Osinek* complaint.  The nature of the conduct
28 is similar such that AA is a condition that the government likely would have investigated given
   *Osinek*'s description of Kaiser exploiting high-value conditions.

**EXHIBIT 1**

United States District Court
Northern District of California

other federal and state law) which are not subject to the first-to-file bar.  *See* Mot at 1 n.3 ("This Motion seeks dismissal of the Later-Filed Complaints . . . in their entirety except for the retaliation causes of action in the operative *Bryant* complaint (Counts 5 through 8) and the California False Claims Act causes of action in the operative *Bicocca* complaint (Counts 3 and 4) . . . .").[17]

According to the *Bryant* plaintiffs, their case is materially different from *Osinek* in that,

> unlike the *Osinek* complaint, the *Bryant/Hernandez* Complaint exposes Kaiser's upcoding fraud: (i) relating to a specific high-value diagnosis code, mechanical ventilator dependence status, that first came to light after Osinek filed her suit[[18]]; (ii) not just on the Medicare Advantage program, but on a different government program (the Affordable Care Act) run by a different government agency entirely (the Department of Health and Human Services); and (iii) within Kaiser's insurance and physician-practice behemoths in all regions, not just one region, and also within Kaiser's massive hospital operation across Kaiser's regions, which was not even part of the *Osinek* suit.

Bryant Opp'n at 2.

For (iii), as noted above, it does not matter that the hospital setting was not expressly implicated in *Osinek*.  Nothing in *Osinek* suggests that it excludes the hospital setting.  The *Bryant* plaintiffs fairly argue that *Osinek* is California-centric; however, as noted above, *Taylor* – the case next in line after *Osinek* – put the government on notice of a nationwide or corporate-wide problem related to the upcoding of high-value conditions.

As for (i), *see* Bryant Compl. ¶¶ 85-86 (alleging that "a patient is vent dependent only if the patient relies on the ventilation to live on a long-term basis and not for the short-term acute phase of a condition" but Defendants fail to comply with that guidance) (emphasis omitted), the *Bryant* plaintiffs are basically making the same kind of argument that the *Stein* plaintiffs did.  *See* Bryant Opp'n at 15 ("Given the sheer number of diagnosis codes, it would be impossible for the government to identify fraudulent over-documenting and upcoding in particular diagnoses without

---

[17] At one point, the *Bryant* plaintiffs also had California FCA claims but they dropped those claims in their FAC.

[18] In their complaint, the *Bryant* plaintiffs explicitly identified additional high-value HCCs or diagnoses but implicitly recognize that these conditions have already been expressly named by plaintiffs in earlier-filed actions.  *See, e.g.*, Bryant Compl. ¶¶ 56, 107, 136, 144, 146-49 (referring to aortic atherosclerosis, sepsis, malnutrition, acute renal failure, acute kidney injury, and respiratory failure, arrythmia for members with pacemakers, major depression, and acute stroke).

**EXHIBIT 1**

being pointed in the right direction.").  But as with *Stein*, this is lesser-included conduct and sufficiently similar to the conduct put at issue in *Osinek* – *i.e.*, Defendants were exploiting high-value conditions by failing to provide support/documentation for the upcoding.  *Cf. Hampton*, 318 F.3d at 219 (concluding actions were related because both alleged that bills were submitted for ineligible and undocumented Medicare services and for services not medically necessary).  The fact that the practice allegedly was not discovered until after *Osinek* was filed does not mean that *Bryant* cannot be a related case.  That Defendants may have allegedly expanded their misconduct to other high-value conditions does not negate the government being put on notice of the fraudulent scheme in the first instance as a result of *Osinek*.

This leaves the *Bryant* plaintiffs with (ii).  Here, the *Bryant* plaintiffs correctly point out that their original complaint contains multiple allegations about payments Defendants receive under the Affordable Care Act (and not just Medicare Advantage).  For example, the *Bryant* plaintiffs allege as follows:

- "The United States contributes to premiums that individuals pay to private health insurance companies such as Kaiser under the Affordable Care Act.  *See* Bryant Compl. ¶ 7; *see also* Bryant Compl. ¶ 52 (alleging that the government contributes through tax credits).

- "The Affordable Care Act sets up a program of risk adjustment in individual and group markets to lessen or eliminate the influence of risk selection on the premiums that plans charge.  In the risk adjustment model utilized under the AA, which is named the HHS-Hierarchical Condition Categories ('HHS-HCC') risk adjustment model, HHS [*i.e.*, the Department of Health and Human Services] utilizes criteria and methods similar to those utilized under the Medicare Advantage Program, and adapts Medicare Advantage HCCs for use in the HHS-HCC model."  Bryant Compl. ¶ 51; *see also* Bryant Compl. ¶ 7.

- Thus, "as under the Medicare Advantage Program, the ACA risk adjustment model creates powerful incentives for private health insurance companies like Kaiser to over-report diagnosis codes in order to exaggerate the expected healthcare costs for

**EXHIBIT 1**

United States District Court
Northern District of California

their enrollees; the more codes that are reported, the higher premiums the companies are permitted to charge, and the higher contributions will be made to such premiums by the United States."  Bryant Compl. ¶ 7.

- "Defendants overdocument and upcode risk adjustment claims relevant to individuals covered by the ACA in the same manner and pursuant to the same schemes as relevant to the Medicare Advantage program . . . ."  Bryant Compl. ¶ 11(b).

- The *Bryant* plaintiffs "seek . . . to recover damages and civil penalties arising from the false or fraudulent records, statements and/or claims that the Defendants made or caused to be made in connection with false and/or fraudulent claims for Medicare Advantage risk adjustment payments [and] Affordable Care Act insurance premiums . . . ."  Bryant Compl. ¶ 18.

In response, Defendants point out that the actual causes of action asserted by the *Bryant* plaintiffs at the end of their complaint refer to risk adjustment payments under Medicare only. *See, e.g.*, Bryant Compl. ¶¶ 209-10, 214-15, 220, 224-26.  Nowhere do the causes of action refer to risk adjustment payments under the Affordable Care Act.  Although Defendants are correct, the *Bryant* plaintiffs fairly point out that each cause of action does incorporate all paragraphs previously pled.  Accordingly, although the *Bryant* plaintiffs could have drafted a better and clearer pleading, they have not pled themselves out of FCA claims based on the Affordable Care Act as Defendants contend.

At the hearing, Defendants argued that, even if the *Bryant* plaintiffs have claims predicated on the Affordable Care Act, they are nonetheless still barred by the first-to-file provision because the government would have been put on notice of that alleged fraudulent scheme by virtue of *Osinek*.  The Court does not agree.  The Affordable Care Act is an entirely different scheme, not run by CMS specifically, and covering a broad range of individuals outside of the reach of Medicare.  The ACA claims thus state causes of action entirely different and distinct from the Medicare Advantage claims.  The government was put on notice of a problem with the Medicare Advantage program only.  That the Affordable Care Act also uses risk adjustment does not mean

44

**EXHIBIT 1**

1    that the government's investigation of Medicare Advantage would naturally lead to an

2    investigation of the Affordable Care Act.

3            Accordingly, the Court dismisses *Bryant* but only in part.  The claims that survive are the

4    retaliation claims, as well as the claims based on the Affordable Care Act.

5    E.      *Osinek* and *Bicocca*

6            Defendants do not seek to dismiss the entirety of *Bicocca*.  Specifically, they recognize that

7    Dr. Bicocca has claims pursuant to the California FCA that are not subject to the first-to-file bar.

8    *See* Mot. at 1 n.3 ("This Motion seeks dismissal of the Later-Filed Complaints . . . in their entirety

9    except . . . the California False Claims Act causes of action in the operative *Bicocca* complaint

10   (Counts 3 and 4) . . . .").

11           Second, the Court takes note that Dr. Bicocca admits his original complaint (filed in

12   February 2020) is barred by the first-to-file provision.  He argues, however, that his FAC (filed in

13   October 2020) adds a theory that is not in *Osinek*.  *See* Bicocca Opp'n at 2.  Because, as discussed

14   above, it is Dr. Bicocca's original complaint that must be compared to the Osinek Complaint, he is

15   out of luck.

16           However, even if the Court were to consider the FAC, Dr. Bicocca's contention that his

17   case is materially different from *Osinek* is without merit.  He states:

18               Relator Bicocca's Amended Complaint describes "two sources" of
                 diagnoses that Kaiser requires physicians to add.  *Bicocca* Dkt. 16 ¶
19               108.  One of these sources is addenda that Kaiser gives physicians
                 *after* a patient visit, which include additional diagnoses for the
20               physician to *retroactively* add to the patient's chart.  *Id.* at ¶¶ 106,
                 110.  The other is a list of the patient's past diagnoses, which Kaiser
21               gives to physicians *before* the physician meets with the patient, with
                 the intention that the physician will re-diagnose each of the specific
22               diagnoses *during* the visit ("upfront list").  *Id.* at ¶ 109.

23   Bicocca Opp'n at 2 (emphasis in original); *see also* Bicocca FAC ¶ 109 ("The first source [for

24   diagnoses that physicians are required to add onto Medicare] are diagnoses that these patients had

25   already, confirmed in previous years by other physicians.  While, as a matter of first impression,

26   this does not seem to be a violation of regulations, since the patients have already had the

27   diagnoses confirmed by others, having physicians re-confirm these diagnoses without spending

28   sufficient time on it and without having any expertise on these diagnoses is still a violation of

United States District Court
Northern District of California

**EXHIBIT 1**

1   Medicare's regulations on confirming diagnoses for the purpose of risk adjustment.").  The

2   problem for Dr. Bicocca is that the latter is essentially refreshing, which has already been put at

3   issue in *Osinek*.

4      Accordingly, the Court grants the motion to dismiss Dr. Bicocca's claims, and the only

5   claims that survive are those based on the California FCA which Defendants have not contested

6   for purposes of the first-to-file bar.

7                         **IV.   CONCLUSION**

8      For the foregoing reasons, the Court grants in part and denies in part Defendants' motion

9   to dismiss based on the first-to-file bar.  Specifically:

10      • *Arefi* and *Stein* are dismissed in their entirety.

11      • *Taylor* is dismissed except to the extent that it pleads (1) a nationwide or corporate-

12        wide fraud; (2) a fraud based on improper coding by external providers; and (3) a

13        fraud based on True Positive results from the NLP program.

14      • *Bryant* is dismissed except to the extent that it pleads (1) retaliation claims and (2)

15        claims based on fraud in the Affordable Care Act program.

16      • *Bicocca* is dismissed except to the extent that it pleads claims based on the

17        California FCA.

18   This order disposes of Docket No. 141.

19

20   **IT IS SO ORDERED**.

21

22   Dated: May 5, 2022

23

24                                            _____

25                                            EDWARD M. CHEN
                                              United States District Judge

26

27

28

United States District Court
Northern District of California

**EXHIBIT 1**